Hillsborough,
No. 5105.

SAMUEL KATZ *v.* WILLIAM KATZ & a.

Argued February 6, 1963.

Decided April 30, 1963.

*Chretien & Chretien* and *Emile R. Bussiere* (*Mr. Bussiere* orally), for the plaintiff Samuel Katz.

*Devine, Millimet, McDonough, Stahl & Branch* (*Mr. J. Murray Devine* orally), for the defendant William Katz.

*McLane, Carleton, Graf, Greene & Brown* and *G. Marshall Abbey* (*Mr. Abbey* orally), for the intervenors Paul George Katz and Ruth Frances Katz Honig.

LAMPRON, J. Joseph and Libby Katz, father and mother of Samuel and William, were the settlors of an *inter vivos* trust, created June 4, 1940, of which William Katz was named the sole trustee. The entire corpus of this trust consisted of real estate situated mainly in Manchester and much of which was in a dilapidated condition and substandard.

From the net income the trustee was to pay Joseph and Libby and the survivor a minimum of $25 per week. The remaining income accruing during the first three years was to be applied as it accrued toward the reduction of existing mortgages on the trust real estate. At the end of that period, the income above the weekly payments to the settlors was to be divided quarterly, or more often if convenient, between William and Samuel in the proportion of 3/5 (60%) to William and 2/5 (40%) to Samuel.

Paragraph 3 of the trust indenture provided that "If Samuel Katz should marry a woman who is not of Jewish faith and religion, then his interest in this trust shall thereupon cease entirely and forever" and pass forthwith to William or his representatives.

Paragraph 4 provided that at the death of the survivor of William and Samuel the trust was to terminate and the trustee was to convey 3/5 of all trust properties then held to whomsoever William by his will should appoint, and in default of such appointment, to his lawful issue. If Samuel died leaving lawful issue born of a wife of the Jewish faith and religion, 2/5 of the trust properties was to go similarly to his appointee or to his

lawful issue. If Samuel died without such issue, his share was to go to William, if living, otherwise to his appointee or lawful issue.

Paragraph 6 provided that "At the end of fifteen years from date, the Trustee may in his discretion convey absolutely free from this trust such of the trust properties as he sees fit to William Katz and Samuel Katz (subject to paragraph 3)." Any such distribution is to be made on the basis of 3/5 to William and 2/5 to Samuel and in case of their prior decease the distribution is to be made to the persons provided for in paragraphs 3 and 4.

Paragraph 13 provided that "At any time after three years from date, both William Katz and Samuel Katz may elect not to receive all or any part of the net income of this trust which may be due thereunder in order that it may be applied toward the reduction of any existing mortgages on any real estate owned by the trust."

Samuel is about sixty years of age and was never married. William is about sixty-three and has two children, the intervenors in this case. There is no issue with respect to the identity of the property in the trust or concerning the weekly payments to the settlors, Joseph and Libby, who are now both deceased.

The master found that there was an oral agreement between William and Samuel to terminate the trust after 15 years which taken together with William's testimony expressing his continued willingness to terminate constituted an election by him to terminate the trust in accordance with paragraph 6 thereof.

The master ordered that the ensuing distribution be made as follows: having found that William had already received a net distribution of $107,422.83, the master decreed that it will be necessary to distribute a total of $179,038.05 (the net distribution received by William being 60% of that total amount) in order to give Samuel the 40 per cent of the total distribution to which he is entitled, which amounts to $71,615.22. As Samuel has already received $10,664.36, the balance due him is $60,950.86.

The master awarded to William compensation as trustee in the amount of $14,760 for the period from June 4, 1943 to December 31, 1948 in accordance with the terms of two written agreements between the interested parties. He disallowed all compensation for the period from January 1, 1949 to December 31, 1955; the amount disallowed is $27,240. The master allowed for the period from January 1, 1956 to December 31, 1959 (the end of the

period covered by the hearings) compensation in the sum of $12,480 and disallowed the greater amount claimed.

The master recommended that William be removed as trustee, he recommended Samuel, and the children of William, Ruth and Paul, as successor trustees and that, in case of objection to their appointment, a neutral person be considered by the Court.

Defendant William and the intervenors, Paul and Ruth, objected to these findings, rulings and recommendations made by the master, to their acceptance by the Court and to the Court's decree in accordance therewith.

We will consider first the master's ruling that the trust be terminated in accordance with the election of the trustee, William, under paragraph 6 of the trust instrument. This paragraph provided that "At the end of fifteen years from date, the Trustee may in his discretion convey absolutely free from this trust such of the trust properties as he sees fit to William Katz and Samuel Katz (subject to paragraph 3)."

This ruling resulted from the following findings made by the master which were warranted by the evidence: (1) "there was an oral agreement between William Katz and Samuel Katz that the income was in general to be retained in the trust to pay the mortgages during the first fifteen years, at the end of that time, that is, in 1955 or thereafter, the trust would be terminated and a division made." An election by both William and Samuel not to receive the income due them and to apply it toward the reduction of trust mortgages was authorized by paragraph 13 of the indenture. (2) "Samuel Katz relied on William's promise that he would terminate the trust, and allowed his money to be left in the trust, to be used to pay mortgages and improve the real estate, being unaware of the extent to which money was being withdrawn by William Katz." (3) "William Katz has expressed a willingness to terminate the trust at this time or to have it terminated by the Court."

The main arguments advanced by the defendants against the order for termination of the trust are that it frustrates the intention of the settlors as expressed in the trust instrument and amounts to an exercise by the Court of the discretion which is reserved to the trustee.

It is well-established law in this jurisdiction that our courts have shown a signal regard for the intention of the parties to an instrument, be they the settlors of a trust, the parties to a con-

veyance or a testator. *Merchants &c. Bank v. Curtis,* 98 N. H. 225, 230; *Citizens Nat. Bank v. St. Peters Lodge,* 102 N. H. 352, 355. We cannot subscribe, however, to the proposition that a termination of the trust in this case by discretion of the trustee in accordance with paragraph 6 would frustrate the intent of the settlors.

William argues in his brief that the trust instrument has as an ultimate material purpose to keep the trust property within the family line and that every provision of the trust is tailored to effect this object. He argues further that by making the trustee's power to terminate under paragraph 6 subject to the provisions of paragraph 3 the settlors intended Samuel to have no absolute interest in the trust corpus unless he should first have married a Jewish wife.

The trust by its own terms is not that tightly insulated against its corpus going outside the family line. Under paragraph 4 if Samuel dies leaving no issue born of a wife of Jewish faith and religion his interest is to pass to William if living, otherwise to whomsoever William by his will appoints and in default of such appointment to his issue. This same paragraph provides that William's share at his decease is to go to his appointee or to his issue in default of an appointment. William's power of appointment is so general that his share and all of the trust corpus remaining at the decease of the survivor of William and Samuel could go to persons who are not members of the Katz family or of the Jewish faith. Restatement, Property, *s.* 356; 41 Am. Jur., Powers, *s.* 4, *p.* 808; See *Fiske v. Warner,* 99 N. H. 236, 237.

Furthermore the contention that Samuel cannot have an absolute interest in the trust corpus unless he has first married a Jewish wife would emasculate William's right, during Samuel's life, to terminate the trust in his discretion which is specifically granted to him in paragraph 6 of the indenture. Consequently a termination of the trust by William in accordance with the provisions of paragraph 6 could not be said to thwart the purposes expressed by the settlors in the trust instrument. *In re Simard Estate,* 98 N. H. 454, 456, 457.

It is also well settled law in this jurisdiction, as argued by the defendants, that while the exercise of discretion granted to a trustee is subject to court supervision, his discretion can in no sense be exercised for him by the court. *Woodward v. Jolbert,* 94 N. H. 324, 326; *Hanford v. Clancy,* 87 N. H. 458, 460;

*Hills* v. *D'Amours,* 95 N. H. 130, 139; *Athorne* v. *Athorne,* 100 N. H. 413, 418.

The record reveals that the master was aware of this principle of law and acted accordingly. He stated during the hearings "As I understand the Trust, I have no power in this case to terminate the Trust." The language of his finding and ruling is to the same effect. "It is, therefore, found that the oral agreement, together with William Katz's testimony, is an election to terminate the trust, as he was empowered to do (Par. #6) by conveying trust property to the beneficiaries . . . Therefore, the master rules that the trust be terminated in accordance with the election of William Katz."

There was evidence in the record to support that finding of the master as well as his other finding that "Samuel Katz relied on William's promise that he would terminate the trust, and allowed his money to be left in the trust, to be used to pay mortgages and improve the real estate." In view of the distribution which William had made to himself, the master could properly rule that if William did not carry out his prior election to terminate the trust on which Samuel relied and which William testified at the hearing, he was still willing to do, his refusal would constitute an abuse of the discretion to terminate granted to him in paragraph 6. The master's ruling that the trust be terminated was not an exercise by him of the discretion reserved to the trustee but an order that William terminate the trust which in his discretion he had agreed to terminate and under the circumstances was under obligation to terminate. Restatement (Second), Trusts, s. 187; See *Morse* v. *Trentini,* 100 N. H. 153, 156.

The trust indenture, dated June 4, 1940, made no express provision for compensation of the trustee. However on May 28, 1943, Libby, the surviving settlor, Samuel and William executed a written agreement which provided that William was to devote his entire time for the period of three years from June 4, 1943, to the management of the trust property and was to be paid the sum of $40 a week in full for his services as trustee. On July 9, 1946, the same parties signed another agreement providing that William was to be paid $60 per week for his services as trustee for a period of three years retroactive to January 1, 1946.

As to the period covered by these agreements, the master found that "Although there is evidence upon which a ruling disallowing all compensation could be based . . . as the parties were not

under disability and as these agreements were not obtained by fraud . . . [they] are binding for the period included therein," that is June 4, 1943 to December 31, 1948.

Although the trust began June 4, 1940, William did not take over its active management until about the end of 1941. He made no claim for compensation for the years 1940 and 1941. The master disallowed William's claim of $1,820 for 1942 and did not allow compensation prior to June 4, 1943 because the first agreement for compensation to William as trustee was not made retroactive by the parties thereto and by its terms became effective June 4. For the period June 4, 1943 to December 31, 1948 the master allowed compensation at the rates contained in the two written agreements which amounted to $14,760. He disallowed all compensation for the period of January 1, 1949 to December 31, 1955. He allowed compensation of $12,480 for the period January 1, 1956 to December 31, 1959, the end of the time covered by the hearings. The total compensation as trustee allowed by the master to William was therefore $27,240.

William takes the position that he should be allowed the full amount of compensation provided for in the compensation agreements until 1953 when he should be allowed $80 per week, the amount with which he has been credited in the trust accounts since then. In fact he maintains the evidence is all to the effect that his claim for compensation was inadequate in view of the services he furnished the trust. He argues that through his efforts the original trust properties have been rehabilitated so that their annual income was increased from $6,737.88, in 1940, to $41,063.07, in 1956, prior to condemnation of part of them. William argues further that the value of the remaining real estate held by the trust has increased in his opinion 40 or 50 per cent over its original value.

In further support of his position, William argues that he devoted himself faithfully to the affairs of the trust with the help of his wife and of his son. That as a result of his valuable services one of the properties was sold at a substantial profit and land which he bought for the trust and now held by it, has greatly appreciated in value. He maintains also that he kept weekly collection cards of his rental income as well as rental cards and that his records were regularly checked by O.P.A. Rent Control personnel from 1941 until 1952. He argues further that the sheer volume of 8,324 cancelled checks, totalling $728,069.07, and the

approximately 2000 deposits relating to $685,696.73 in receipts, presented by him in his accounting, give some indication of the magnitude of his task.

In allowing compensation to William as trustee in the total amount of $27,240, the master ruled that although "William Katz as Trustee is by law entitled to reasonable compensation for his services in the absence of any provision in the trust indenture or agreement of the parties, nevertheless, such compensation is not to be allowed as a matter of right, and may be forfeited upon failure to keep proper accounts or other breach of duty. The master finds that William Katz failed to keep proper accounts of rent received, or of cash paid out as evidenced . . . by un-accounted for deficiency or excess in deposits in each year . . . and by even more startling discrepancies in cash balance on hand."

There was ample evidence from which the master could find, as he did, that for many years, William, as trustee, kept inadequate records. He kept no cash records prior to 1956 and kept no duplicate deposit slips. The rents were often collected in cash and before deposit in the checking account certain payments were made in cash making it impossible to find with certainty what the total amount of rents received might have been. There were no invoices or contemporaneous book entries prior to 1956 to substantiate the payments made by the over 8000 checks previously referred to. The master could also find on the evidence that all but 38 of the rental cards had been destroyed, "possibly on the mistaken assumption they would not be needed," and that those in existence did not appear to be contemporaneous records and did not include the dates rents were received.

The evidence also supported the following findings. In the period 1942 through 1955 there were excesses of cash deposited over cash receipts accounted for in nine of those years, ranging from an annual low of $840.77 to a high of $8,708.02 for a total of $27,231.18. Also that there were deficiencies of cash deposited to cash receipts in five of those years from an annual low of $38.49 to a high of $2,431.56 for a total of $5,469.94.

The master also found that William "further breached his duties as Trustee by using funds for payment of personal bills, for his daughter's wedding, for construction of his home, for utilities, for purchase of a car, etc. Because of this personal use of trust funds there has been a depletion of cash in the trust

resulting in greater interest charges to the trust because of failure to pay off outstanding mortgages."

The funds so used were a substantial part of the distribution of $107,422.83 charged to William by the master. The parties agreed that between the years 1942 and 1959 payments of $233,170.74 were made from trust funds on the principal of outstanding trust mortgages and $58,018.40 for interest. There was an outstanding mortgage debt of $65,464.83 on the trust properties taken by eminent domain in 1960. The facts support the findings of the master previously referred to as well as the following finding.

"The Master has considered the Trustee's breach of duty in the light of his knowledge and experience, and finds that the breach was occasioned by his negligence and in many instances by deliberate disregard of the rights of Samuel Katz; that it related to the entire management of the trust, and has occasioned substantial losses to the trust, which are somewhat offset by the value of his services in improving the property."

The law is well settled that if a trustee commits a breach of trust, the Court may in its discretion deny him all compensation, allow him a reduced compensation or full compensation. *Stevens* v. *Stevens,* 97 N. H. 135, 140; *McInnes* v. *Goldthwaite,* 94 N. H. 331, 337; Restatement (Second), Trusts, *s.* 243. In exercising its discretion, the Court should consider whether the breach of trust was in good faith or otherwise; intentional, negligent or without fault; relates to the management of all or part of the trust property; has occasioned loss; and the value to the trust of the trustee's services. Restatement (Second), Trusts, *s.* 243, *comment* c.

It would serve no useful purpose and would lengthen this opinion unduly if we were to recite further the evidence which supports the master's findings and rulings pertaining to the compensation allowed the trustee for his services. Suffice it to say that a careful examination of the voluminous record of the hearings and of the pertinent exhibits reveals the existence of such supporting evidence.

On the record we cannot say as a matter of law that the Court's decree as to the trustee's compensation in accordance with the master's reports was arbitrary and capricious or that it plainly and unmistakably fails to do equity to all the interested parties. Consequently there is no reason to disturb the decree and it is sustained. *Stevens* v. *Stevens,* 97 N. H. 135, 140, 141.

After ruling that the trust should be terminated, the master decreed that the distribution should be made in the following manner. Having found that William had paid out of trust funds $107,422.83 for his own benefit, the master ruled that as to those payments the trustee was to be held to have elected to distribute principal as well as income because it was impracticable if not impossible to make an accurate allocation. Rather than order William to repay any part of that sum to the trust, since it was to be terminated, the master decreed that Samuel was first to receive all cash and proceeds from liquidation of the trust remaining after payment of its debts and expenses, until he had received an amount which would make Samuel's distribution 40% and William's 60% as provided by the trust indenture.

In order to attain this result, the master ruled that it will be necessary to distribute a total of $179,038.05 of which the amount already received by William ($107,422.83) is 60%. Samuel would receive $60,950.86, which with the $10,664.36 he has already received, will make a total distribution to him of $71,615.22, equal to 40% of the total amount of which William's distribution already received is 60%.

The master further decreed that thereafter all distributions to be made shall be 60% to William and 40% to Samuel.

The defendants object to the master's method of distribution on the ground that the master is in fact exercising the discretion vested in the trustee, and to be exercised by him alone, as to the amount of trust assets to be distributed and its allocation between income and principal. They propose that the distribution should be made in the following manner. William has received a distribution of $107,422.83 and Samuel one of $10,664.36, a total trust distribution of approximately $118,000. The master should therefore order that Samuel receive the unpaid balance of his 40% share of that total amount. The intervenors argue this should be accomplished by ordering William to pay Samuel the amount by which the distribution William has received exceeds 60% of approximately $118,000 or in exact figures $36,570.52.

We are of the opinion that the method of distribution decreed by the master is supported by the evidence and by the terms of the trust indenture. William, when asked why he began writing checks for his personal use in 1941, stated "I had 60 percent profit in the trust, which was duly and justly conveyed to me, and I had an interest there, and I knew I was not taking more

than I had in there." He also testified he did not tell Samuel about these withdrawals "but I told him this will be liquidated and whatever I take out will be deducted from my interest and he would get the rest on that .basis." He testified further that he continued making withdrawals through 1959 "because I still have some interest in the trust money which are due me, and some day, with the help of God, this court will balance the books and decide how much is coming to me and how much to Sam. I am not questioning what is coming to Sam." The master could properly find on this evidence that William, the trustee, considered the disbursements to his personal use as distributions to him as beneficiary under the trust.

Paragraph 2 of the indenture provided that any payment of net income was to be made three-fifths to William individually and·two-fifths to Samuel. Paragraph 6 provided that any·distribution under its terms were to "be distributed on a proportional basis of three-fifths of the total value of the properties . . . to William Katz . . . and two-fifths of the total value of the properties . . . to Samuel Katz."

As between Samuel and William, the only beneficiaries with vested interests, the latter cannot complain if the master treats as distributions instead of misappropriations the moneys he paid as trustee to himself for his own use. Having in his discretion made such distributions, he could properly be ordered to distribute sufficient assets to Samuel to comply with the terms of the trust so as to prevent his acts from constituting an abuse of discretion. *Wentworth* v. *Waldron*, 86 N. H. 559, 562; Restatement (Second), Trusts, s. 187, *comment* b. The intervenors have no basis for complaint as the termination of the trust and distribution of the assets between William and Samuel were properly decreed.

The master's recommendation that William be removed from the office of trustee was warranted by the evidence. See Scott, Trusts (2d *ed.*) s. 107. There being no order of the Superior Court before us pertaining to the appointment of a successor there is no occasion for us to consider this question.

*Exceptions overruled.*

All concurred.