Hillsborough
No. 85-323

CHARLES W. BARTLETT & a.

v.

PIERRE DUMAINE & a.

October 2, 1986

498

*Devine, Millimet, Stahl & Branch*, of Manchester (*Joseph A. Millimet* on the brief and orally), and *Gaston Snow & Ely Bartlett*, of Boston, Massachusetts (*Alan L. Lefkowitz & a.* on the brief, and *Mr. Lefkowitz* orally), for the petitioners.

*McLane, Graf, Raulerson & Middleton*, of Manchester (*Robert A. Raulerson* on the brief and orally), *Hamblett & Kerrigan*, of Nashua (*Joseph M. Kerrigan* on the brief), *Richardson, Tyler & Troubh*, of Portland, Maine (*Robert J. Piampiano* on the brief and orally), and *Lord, Day & Lord*, of New York, New York (*John W. Castles III* on the brief and orally), for the respondents.

502

KING, C.J. This case involves a dispute between several beneficiaries and the trustees concerning the management of a business "complex." The complex includes "Dumaines," a New Hampshire trust; Dexter Trust, a Massachusetts trust; several smaller "satellite" trusts also formed in Massachusetts; and the Amoskeag Company, a Delaware holding company owned in large part by Dumaines, Dexter, and the satellite trusts.

This litigation was initiated by a petition for declaratory judgment filed by the trustees of Dumaines and the Dexter Trust. The trustees requested a decree stating that they have no duty to furnish accountings of the Dexter Trust to discretionary income beneficiaries of Dumaines. Several Dumaines income beneficiaries, who are respondents in this case, had demanded such an accounting because the Dumaines Trust has a vested remainder interest in the Dexter Trust; that is, when the current income beneficiary of Dexter dies, the corpus of Dexter will pour over into Dumaines. In response to the declaratory judgment proceedings, the trust beneficiaries brought further claims which are discussed below. The Master (*Robert I. Eaton*, Esq.), who was approved by both sides, sat during a seventeen-day hearing and found that the Dumaines' beneficiaries were not entitled to an accounting of Dexter. He also found no merit to any of the allegations of breach of trust made by the beneficiaries against the Dumaines' trustees. Finally, the master ruled that the respondents were not entitled to attorneys' fees. The Superior Court (*Bean*, J.) approved the master's report, and the respondents appealed to this court. We affirm that part of the decision involving the allegations of breach of trust by the Dumaines' trustees and regarding the award of attorneys' fees. We reverse and vacate that part of the trial court's decision relating to whether, how, and to whom Dexter's trustees must account. We hold that a Massachusetts court is the proper forum for the consideration of that issue.

The builder of the Dumaine family business complex was Frederic C. Dumaine, Sr. He was responsible for the creation of the trusts involved in this litigation, and his contributions formed the *res* of each trust. Dumaine, a New England business leader, had seven children, four of whom were living at the time of the master's report.

In 1911, the elder Dumaine started the Amoskeag Company, originally formed as a voluntary association and later incorporated under Delaware law in 1965. Amoskeag Company today owns Fanny Farmer Candy Shops, Inc., Fieldcrest Mills, Inc. and several other companies.

Dumaines Trust was created by Frederic C. Dumaine, Sr., and others in 1920 by a declaration of trust empowering the trustees "to

acquire property of various kinds and from various sources and in their associated capacity to carry on business under and in accordance with the provisions" of the declaration of trust. Dumaines is designed to accumulate capital. The trustees must add the first half of the trust's annual net income to the trust corpus. They may "in their sole discretion" pay the other half of the annual net income to such of Frederic C. Dumaine, Sr.'s legitimate children and grandchildren, in such amounts as the trustees decide. By its terms, Dumaines will remain in existence twenty-one years after the death of the settlors and their children living at the time of Dumaines' creation. The settlors, in the trust declaration, recommended to the eventual Dumaines' remainder interests that the distributed assets of Dumaines be put back into a Dumaines-like trust.

In 1926 Frederic C. Dumaine, Sr., created seven separate trusts with beneficial interests for each of his seven children (the so-called satellite trusts). Each of these trusts provides that one-half of the annual income shall be added to principal and that the other half may, in the sole discretion of the trustees, be paid quarterly in the following year to the particular child beneficiary. Dumaine funded them in unequal amounts and named his son, Frederic C. Dumaine, Jr. ("Buck"), one of the two trustees of each of these satellite trusts. Upon the death of the income beneficiary of a satellite trust, the trust corpus pours over into Dumaines.

The Dexter Trust, whose nominal settlor was William Dexter, was actually created by Frederic C. Dumaine, Sr., in 1932, names Buck as trustee and provides that Buck will be the sole discretionary income beneficiary. The trustee or trustees may, within their discretion, distribute all net income to the beneficiary. If Buck had predeceased his father, the elder Dumaine would have become the income beneficiary. The trust instrument also provides that upon the death of the survivor of Buck and his father, the trust estate shall be added to the Dumaines Trust corpus and administered as a part of it. Frederic C. Dumaine, Sr., died on May 27, 1951, and Buck survived him. Upon Buck's demise, the assets of the Dexter Trust are to be added to Dumaines. Buck's beneficial interest in Dexter is in addition to his interest in his own 1926 satellite trust.

In the event of a vacancy in the office of trustee of the Dexter Trust, Frederic C. Dumaine, Sr., was vested with the exclusive power to appoint the successor trustee or trustees, including himself, and upon his decease, this authority vests in the trustees of Dumaines, who can elect trustees to the Dexter Trust by majority vote. Although Buck, the income beneficiary of Dexter, was named the sole trustee when the trust was created, he resigned on March 6,

1942, as trustee of the Dexter Trust, and the successor trustees were then appointed by Frederic C. Dumaine, Sr.

Frederic C. Dumaine, Sr., along with his son Buck and his other associates, dominated both Dumaines and the Amoskeag Company. The elder Dumaine served as Amoskeag's treasurer until 1939; he was Dumaines' treasurer from 1920 to 1922 and again from 1925 to 1940. His son Buck served as Amoskeag's treasurer from 1939 to 1962; he was Dumaines' treasurer from 1922 to 1925 and from 1948 to the time of the master's report. In all, during the elder Dumaine's life, thirteen persons served both Amoskeag and Dumaines simultaneously. Six persons were paid salaries by Amoskeag while also serving as Dumaines' trustees. It appears that while the elder Dumaine was alive no distributions of income were made to discretionary income beneficiaries from any of the trusts.

After Frederic Dumaine, Sr.'s death, Buck replaced his father as the dominant figure in the Dumaine "complex." At the same time, Buck and the other trustees of Dumaines, Dexter, and the satellite trusts have made regular, substantial distributions of income to each of the beneficiaries. Despite these income distributions, all the trusts enjoyed substantial growth in principal from 1951 to 1982.

On a number of occasions since their father's death, several of the elder Dumaine's children have expressed dissatisfaction with the fact that, unlike Buck, they have no control over Dumaines or the 1926 satellite trusts, particularly with regard to who serves as trustee and what investments will be made with trust assets. When, in the late 1970's, Frederic C. Dumaine, Sr.'s son Pierre Dumaine ("Spike") sought an accounting of the Dexter Trust, the Dumaines and Dexter trustees commenced this suit.

 At the outset, we must consider the duties of the trustees in managing a complex trust. In determining what the duties of the trustees are in this case, "our purpose is to effectuate the settlor's intention in creating the trust. '[I]t is well established in this jurisdiction that our courts have shown a signal regard for the intention of a settlor of a trust. . . .'" *Indian Head Nat'l Bank v. Brown*, 123 N.H. 87, 91, 455 A.2d 1056, 1058 (1983) (quoting *Indian Head Nat. Bank v. Rawls*, 105 N.H. 142, 144, 194 A.2d 767, 769 (1963)). We will give effect to the settlor's intent unless that intent is contrary to statute or public policy. *See In re Frolich Estate*, 112 N.H. 320, 327, 295 A.2d 448, 453 (1972).

 In determining the settlor's intent, courts should look to the terms of the trust. In a case such as the present one, where a court is construing an inter-vivos trust evidenced by a written

instrument, "the terms of the trust are determined by the provisions of the instrument as interpreted in the light of all the circumstances and . . . other [competent] evidence of the intention of the settlor with respect to the trust . . . ." RESTATEMENT (SECOND) OF TRUSTS § 4, comment (d) (1959). "The relationship of the settlor to the beneficiaries and [the] duties toward them are among the facts to be considered by a court trying to place itself in the shoes of the creator of the trust in order to ascertain what [was] intended by the trust instrument." *Indian Head Nat. Bank v. Rawls, supra* at 145, 194 A.2d at 769 (citations omitted). Although extrinsic parol evidence is inadmissible to vary or contradict the express terms of a trust, such evidence may be received to determine the settlor's intent where the language used in the trust instrument is ambiguous. *Indian Head Nat'l Bank v. Brown, supra* at 91, 455 A.2d at 1058.

■■ The settlor's intention is a question of fact to be determined by competent evidence, and not by rules of law. *Cf. Osgood v. Vivada,* 94 N.H. 222, 224, 50 A.2d 227, 228 (1946); *Edgerly v. Barker,* 66 N.H. 434, 31 A. 900 (1891) (determining a testator's intent is a question of fact). On appeal, we will sustain the master's findings of fact if, on the reported evidence, "any reasonable [person] could so find." *Brown v. Mary Hitchcock Memorial Hosp.,* 117 N.H. 739, 744, 378 A.2d 1138, 1141 (1977).

## I. *The Fanny Farmer Loan*

The respondent beneficiaries' first argument on appeal is that the trustees of Dumaines breached their fiduciary duty when they made an unsecured, fixed-rate loan of $4 million to Fanny Farmer, a subsidiary of Amoskeag. The beneficiaries argue that loans made from Dumaines without collateral security are *ultra vires,* in that they are forbidden by the Dumaines declaration of trust. The beneficiaries also contend that the loan did not meet the standard of prudence which New Hampshire common law requires of a fiduciary investing trust property.

The record shows that in 1979 Fanny Farmer was having financial difficulty. The Amoskeag board of directors decided that to improve its subsidiary's performance, Amoskeag needed to invest several million dollars in Fanny Farmer. The Amoskeag directors also decided to increase Amoskeag's ownership share of Fanny Farmer from 41% to 100% prior to investing additional monies in the candy company. In order to buy out the 60% of its stock that was publicly owned, Fanny Farmer borrowed approximately $5.7 million from the Mellon Bank in January, 1980. At Mellon Bank's insistence, Amoskeag acted as guarantor of the loan. The interest

rate was set at 107% of the prime interest rate for the first two years of the loan and 109% of the prime rate thereafter.

Within three months after the Mellon Bank loan to Fanny Farmer, the prime interest rate climbed from 15% to 20%. The steep climb in interest rates caused the rate on the Mellon Bank loan to climb dramatically. The Amoskeag board of directors decided that the increased interest costs would adversely affect their turnaround plans for the candy maker. In April, 1980, the Dumaines' trustees agreed to loan Fanny Farmer $4 million from the trust to repay the Mellon Bank loan. The Dumaines loan interest rate was set at a fixed 15%. The $4 million was taken from New England Merchants Bank certificates of deposit held by Dumaines that were earning 12% to 13% in interest. The Dumaines' trustees made the loan to Fanny Farmer without taking collateral security or demanding a guarantee from Amoskeag that it would repay the loan should Fanny Farmer default. Fanny Farmer repaid the loan before its due date in December, 1981.

■■ It is a general principle of New Hampshire's common law of trusts that, in making investments for a trust, the trustee must exercise the care and skill of a prudent person in *conserving the property*, rather than the care and skill of a person of ordinary prudence. *Miller v. Pender*, 93 N.H. 1, 3, 34 A.2d 663, 665 (1943). In *Miller*, we explained that, in applying what we will now call the "prudent conservator" standard, "'reference is to be had to the conduct of [a person of average prudence] in making permanent investments of . . . savings outside of ordinary business risks, rather than to . . . conduct in taking business chances.'" *Id.* at 3, 34 A.2d at 665–66 (quoting *Mattocks v. Moulton*, 84 Me. 545, 552, 24 A.2d 1004, 1006 (1892)). *See generally* C. DEGRANDPRE, 7 NEW HAMPSHIRE PRACTICE, WILLS, TRUSTS AND GIFTS § 721, at 297–98 (1986). *Cf.* RSA ch. 564-A (1974) (Uniform Trustees' Powers Act) (establishing a more liberal "prudent [person]" standard for trustees of trusts established after the statute's effective date, August 29, 1969).

■■ General principles of New Hampshire trust law also include a strong presumption in favor of trustees' accepting collateral security when making a loan. Contrary to the respondent beneficiaries' suggestion, there is no absolute rule that trustees must accept collateral security in addition to personal security in lending trust assets. *Knowlton v. Bradley*, 17 N.H. 458, 459 (1845). Nonetheless, a trustee of a conventional trust, whose chief duty is to safeguard and expand the trust *res* for the benefit of income beneficiaries and remainder interests, should either accept sufficient collateral

security when making a loan of trust assets or "be prepared to show that the borrower was, at the time [of the loan], possessed of property, and in good credit, and that [the trustee] has taken [personal] security in the names of persons of like standing." *Kimball v. Reding*, 31 N.H. 352, 375 (1855).

These general principles of trust law apply to a trustee unless the settlor imposes different constraints on the trustee. "[I]t is this State's rule that a person's right to dispose of property by will or trust in such manner and by such means as [seen] fit includes the right to increase or decrease those burdens which are ordinarily imposed upon fiduciaries by statute and which are not required to maintain judicial authority over the trust or estate. It is equally true that a testator [or settlor] may relieve a trustee or executor of most common-law burdens. . . ." *Frolich Estate*, 112 N.H. at 327, 295 A.2d at 453. Of course, provisions of a trust instrument that purport to enlarge the trustee's power to use discretion in making investments of trust property beyond the statutory and common law strictures will be strictly construed. *Miller v. Pender*, 93 N.H. at 4, 34 A.2d at 666.

In this case, the master found that Dumaines "is a unique trust, having features of both a trust and a corporation," and that "[t]he general intent of F. C. Dumaine in setting up Dumaines was to authorize his Trustees 'in their associated capacity to carry on business' 'so far as convenient and practicable' under the name of 'Dumaines.'" It was the settlor's general intent to give the trustees "absolute control of trust property and trust business." The master also found that "[s]ince the Dumaines Trustees are to establish and carry on businesses, the settlor clearly intended that the 'prudent [person] rule' of investment would not be applicable."

"From the outset," according to the master, "F. C. Dumaine treated Dumaines and Amoskeag as a coordinated operation . . . intend[ing] the Trustees to work with and through the Amoskeag Company in the same way that he did, to make coordinated investments and gain control of businesses." The master also found that since F. C. Dumaine's death, the Dumaines' trustees have conducted the trust's business in accord with the settlor's intent. In the case of the Fanny Farmer loan, the master concluded that the trustees' discretionary powers over Dumaines' business affairs, taken together with the settlor's intent for Dumaines to work with Amoskeag for the control of businesses, constitutes "clear authority for the making of the Fanny Farmer loan. . . ."

On the record before us, we conclude that a reasonable person could find that the settlor intended the trustees of Dumaines,

within their discretion, to take business risks with trust funds in concert with the Amoskeag Company. A reasonable person could also find that the trustees' discretion encompassed the right to determine how much collateral security needed to be taken in exchange for a loan of trust assets. Therefore, we uphold the master's finding.

 In reaching this decision, we recognize that there are different standards of prudence in investment which a settlor may choose to impose on a trustee. The settlor may choose to have the trustee follow the strict "prudent conservator" standard we set out in *Miller*; the more liberal "prudent [person]" standard of RSA chapter 564-A; or the even less stringent standard of a person free to take business risks, which is the standard the master found was the settlor's choice in this case. Finally, the settlor is free to impose on a trustee a standard of prudence stricter than the one set out in *Miller*.

The respondents fault the master for declining to make a specific finding whether the Dumaines indenture, specifically article I, section 4, required the trustees to take collateral security when loaning trust assets. Article I, section 4 states in part that:

> "The Trustees are authorized to . . . lend money or property, accepting such collateral as in their judgment seems adequate. . . ."

It is the respondents' contention that this grant of a specific power to the Dumaines' trustees by the settlor . . . "made it clear beyond question that the trustees were bound by the common law requirement of collateral," and that the master's failure to rule specifically on this clause was "egregious error." We disagree.

The master made no ruling on whether the quoted provision of the Dumaines Declaration of Trust requires the taking of *some* collateral security. The master did find that in granting specific powers to the trustees, the settlor did not limit the trustees' general powers. The master also concluded that the Dumaines indenture was "ambiguous" regarding the way the settlor intended Dumaines to be run, and for this reason he looked to extrinsic evidence to determine the settlor's intent. The master heard and apparently considered testimony by Spike Dumaine that his father often used Dumaines trust assets in risky business ventures and that the elder Dumaine often did not accept collateral security when loaning trust assets. It is clear to us that the master found that regardless of what article I, section 4 seems to require, the settlor intended the Dumaines' trustees to take business risks and also to decline to take

collateral security when they deemed it proper. The master's failure to rule specifically on article I, section 4 is not error, where he ruled based on the terms of the trust as a whole that the settlor intended the trustees to be free to take business risks.

■■ In fact, we question the respondent beneficiaries' interpretation that article I, section 4, read in isolation from the rest of the terms of the trust, requires the taking of at least *some* collateral security whenever trust assets are lent. As we have noted, under general principles of New Hampshire common law, the scope of trust investments a trustee can make is narrow. However, when a settlor allows a trustee to exercise "discretion" in making investments, as in the elder Dumaine's provision for the trustee to use "judgment" in deciding whether to take collateral security, the settlor frees the trustee to act as a "prudent person," *see* RSA chapter 564-A (1974), rather than as a "prudent person seeking to conserve the property." *See Miller*, 93 N.H. at 3, 34 A.2d at 665. In other words, the settlor, by using such language, lessens the trustee's common law burdens. "Where by statute or by judicial decision the scope of trust investments is narrow, an authorization to the trustee to make investments 'in his [or her] discretion' is ordinarily interpreted to enlarge [the trustee's] powers so that [one] can properly make such investments as a prudent [person] would make." A. SCOTT, THE LAW OF TRUSTS § 227.14, at 1849 (3d ed. 1967) (citing *Miller*, 93 N.H. at 4, 34 A.2d at 666). In addition, we think it is the better view that when "a trustee can properly invest in such securities as those in which a prudent [person] would invest, . . . it is not necessarily improper to invest in unsecured obligations . . . if they are of such a character that a prudent [person] would purchase them." A. SCOTT, THE LAW OF TRUSTS § 227.8, at 1820 (3d ed. 1967). *Contra* G. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 678 (Rev. 2d ed. 1982). This interpretation of trust indenture language is in keeping with "a statutory tendency to relax the rule against the investment of trust funds in unsecured promises to pay" such as certificates of deposit, savings bank accounts, insurance policies and annuity contracts, and loans to corporate obligors. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 678, at 84–85 (Rev. 2d ed. 1982); *see* RSA 564:18. We note in passing that if we had subscribed to the beneficiaries' interpretation of article I, section 4 of the indenture, then the bank certificates of deposit which the Dumaines' trustees liquidated in order to make the Fanny Farmer loan, and which the respondent beneficiaries seem so greatly to prefer to the loan to the candy maker, would also be prohibited since they are promises to pay unsupported by collateral security.

We also disagree with the beneficiaries' argument that the master based his decision on a faulty legal understanding of the effect of an exculpatory clause in a trust indenture. The master found that the trustees acted in good faith and so were covered by the Dumaines Trust exculpation clause even if article I, section 4 required collateral security. The master did not conclude that a trustee exculpation clause relieves the trustees of liability for doing an act forbidden by the trust indenture. *See Kimball v. Reding*, 31 N.H. 352, 373–74 (1855). On the contrary, the master specifically found that "[a] trustee who acts *ultra vires* is not protected from liability by an exculpatory clause." (Emphasis added.) Thus, it is clear from the record that the master did not decide that the trustees' failure to take collateral security in the Fanny Farmer transaction was *ultra vires* but was excused by the good faith exculpation clause. Instead the master found that such ventures as the making of the unsecured loan to Fanny Farmer were part of the settlor's intent for Dumaines.

## II. *Ely's Alleged Breaches of Trust*

The respondent beneficiaries' next argument on appeal is that Joseph F. Ely, II, a trustee of the Dumaines and Dexter trusts, and an officer of Amoskeag and several of its subsidiaries, breached his duty of undivided loyalty by committing self-dealing in bad faith when he purchased a yacht from an Amoskeag subsidiary; when he accepted an interest-free loan from Amoskeag to pay off his home mortgage; and when he entered into a long-term employment contract with Amoskeag.

Ely purchased the yacht from Duxbury Marina Corporation, owned 100% by Moore's Falls Corporation, which in turn is owned 100% by Amoskeag. Ely was an officer and/or director of all three entities. Duxbury Marina originally purchased the yacht in July, 1977 for $167,417, using the proceeds of a bank loan. When Duxbury Marina was unable to sell the boat, Ely, in August 1978, advanced the company $150,000 of his own funds to pay off the bank loan. Ely's advance to Duxbury was not interest bearing and was unsecured. In exchange for the advance, Duxbury agreed that if it sold the boat for $150,000 then Ely would be repaid in full; if Duxbury sold the boat for less than $150,000 then Ely would be repaid the lesser amount; and if the company sold the boat for more than $150,000 then Ely would be repaid only $150,000.

By 1980, Duxbury's financial well-being was steadily declining, and the Amoskeag Audit Committee ordered that the yacht be sold. Efforts to sell the boat on the open market proved fruitless, presum-

ably because the boat was burdened with manufacturing defects. A June, 1979 appraisal put the boat's value at $132,000, and an April, 1980 appraisal found that the yacht was worth $128,000.

After other efforts to sell the yacht failed, Ely, on July 3, 1980, purchased the boat himself from Duxbury for $110,000. Ely paid Massachusetts sales tax of $5,500 on the yacht. Amoskeag paid Ely $34,500, which was the difference between the total cost of sale ($110,000 + $5,500 = $115,500) and the $150,000 which Ely had advanced to Duxbury in 1978.

In March, 1981, Ely resold the yacht through a broker, netting $148,500 for the boat, after commissions and sales expense. The beneficiaries claim that Ely personally profited in the yacht transaction by $33,000. The trustees claim that the beneficiaries fail to note that Ely, as a private party, was able to sell the boat without any warranty; that Ely expended a great deal of his own money in rehabilitating the vessel prior to resale; and that Ely had let Duxbury use his $150,000 advance for nearly two years without interest.

In November, 1976, Ely was an Amoskeag employee, and was slated to become Amoskeag's chief executive officer, at the beginning of 1977. Ely had an outstanding home mortgage of $95,000 at the National Shawmut Bank, a bank with which Amoskeag regularly did business. Buck Dumaine suggested that it would be wise for Ely to pay off the mortgage loan so that Ely would not be forced to take into account his own relationship with the Shawmut Bank when dealing with the bank for Amoskeag. To facilitate Ely's repayment of the mortgage loan, Amoskeag loaned Ely $45,000, interest-free and payable on demand. The loan was not evidenced by a note and was unsecured. Information about the loan was regularly included in Amoskeag proxy material, and the imputed interest on the loan was classified in company records as compensation to Ely.

The five-member Amoskeag executive committee, of which Buck Dumaine and Ely were members, voted to approve a new five-year employment contract with Ely, effective January 1, 1981. The full Amoskeag board of directors subsequently approved the Ely contract. Under the terms of the agreement, Ely was to receive a base salary of $250,000 per year, which was to be indexed for cost of living increases on an annual basis. The contract also provided that Ely could retire after 15 years with Amoskeag. His pension would be set at not lower than 50 percent of the average of his earnings from his five highest years of compensation. Since Ely began work with Amoskeag in 1970, he would thus be able to retire in 1985 at age 47.

The petitioner trustees claim that the Dumaines' beneficiaries do not have standing to question the trustees' actions with regard to

corporate assets such as the Duxbury yacht, since the trustees performed those actions not as trustees, but as officers and directors of the several corporations, including Amoskeag, controlled by Dumaines. The trustees contend that the Duxbury yacht and the level and nature of Ely's compensation as an Amoskeag executive involve exclusively *corporate* assets and concerns, and not those of the trust. The trustees maintain that their actions as corporate functionaries in regard to corporate affairs can be questioned only by a stockholders' derivative suit brought under the provisions of Delaware corporation law. The trustees add that the beneficiaries do not even have standing to bring such a derivative action against the trustees as corporate officials since the trustees, and not the beneficiaries, are legally the shareholders of Amoskeag. Finally, the trustees argue that the trustees' corporate decisions cannot be examined by the superior court or by this court because the Amoskeag Company is not a party in this case.

The trustees are correct in their assertion that the Duxbury yacht was a corporate rather than a trust asset, and that the level and nature of Ely's compensation are corporate concerns. Nevertheless, the beneficiaries have standing to question decisions made by Dumaines' trustees in their capacities as Amoskeag officers and directors when decisions amount to a breach of duty to Amoskeag and when such corporate decisions may affect the value of the corporate stock, which *is* an asset of Dumaines. The trustees apparently ignore the fact that a suit concerning the administration of a New Hampshire trust such as Dumaines is an *equitable* action and that the niceties of Delaware corporation law will not shield the trustees from being called to answer personally for their conduct in operating trust-controlled enterprises. Thus, the fact that the beneficiaries have no standing to bring a shareholders' derivative suit, or that they failed to make the Amoskeag Company itself a party, has no bearing on their ability to question the alleged corporation wrongdoing of the trustees. In assuming positions of authority in a Delaware corporation controlled by a New Hampshire trust, the trustees do not cease to be subject to the laws of the New Hampshire regarding fiduciaries.

Where, as in this case, a trust instrument allows the trustees to operate trust-controlled corporations, the trustees have wide discretion in running the corporate enterprises. A court, in enforcing the terms of the trust, will interfere in the trustees' corporate decisions only where the trustees have abused their discretion. *See* A. SCOTT, THE LAW OF TRUSTS § 193.2, at 1598 (3d ed. 1967). In

operating the trust-controlled corporations, the trustees are thus free to exercise their "business judgment." *See id.; see also In Matter of Ebbets' Will*, 248 N.Y.S. 179 (Sur. Ct. 1931) (whether the trustees holding 50% of the stock of the corporation which owned a Brooklyn baseball field should authorize a mortgage to finance expansion of the ball park was a matter of business judgment).

We think it is the better view that when the settlor permits a trustee to serve as an officer or director of a trust-controlled corporation, the trustee need not account to the trust for reasonable amounts of salary and other compensation which that trustee receives as a corporate official. In other words, a trustee/corporate official does not commit an abuse of discretion either in voting to reasonably compensate another trustee/corporate official or in personally accepting such reasonable compensation. *See Perry v. Perry*, 339 Mass. 470, 160 N.E.2d 97 (1959). *See generally* A. SCOTT, THE LAW OF TRUSTS § 170.22, at 1377–78. *Contra Stone v. Baldwin*, 347 Ill. App. 128, 106 N.E.2d 379 (1952). Adoption of this view is consistent with this court's long-standing position that trustees may be compensated, *see Marston v. Marston*, 21 N.H. 491 (1850), and with New Hampshire statutory law, *see* RSA 564:21 (governing trustee compensation). As we held in *Hollis v. Tilton*, 90 N.H. 119, 122–23, 5 A.2d 29, 36 (1939), "[t]he principle that a fiduciary can make no profit out of the trust estate is generally held to be strict and rigid. . . . But the rule should not be applied in so arbitrary a manner as to produce inequitable results of undue hardship. [T]he trustee may not profit from the trust, [but] should not be required to bestow gifts upon it." *Id.*

Although a trustee's acceptance of compensation as an officer or director of a trust-controlled corporation, or the awarding of such compensation, is not *per se* a breach of trust requiring an accounting to the trust, the acceptance or awarding of *unreasonable* compensation would be a breach of duty as a corporate official and, thus, it would also be an abuse of discretion as a trustee which will make the trustee accountable to the trust. *See In Estate of Feraud*, 92 Cal. App. 3d 717, 154 Cal. Rptr. 889 (1979).

Thus, when a trustee abuses discretion by committing a breach of duty to a trust-controlled corporation, and when this breach of duty causes a diminution in the value of the corporation, the trustee may be held accountable either as a corporate officer to the shareholders, or as a trustee to the beneficiaries. *See Matter of Auditore*, 249 N.Y. 335, 164 N.E. 242 (1928); *Miller & Lux, Incorporated v. Anderson*, 318 F.2d 831 (9th Cir. 1963), *cert. denied*, 375

U.S. 986 (1964). *See generally* A. SCOTT, THE LAW OF TRUSTS § 193, at 1592–94 (3d ed. 1967).

The master found that when Ely and the other corporate directors approved the yacht sale they committed no wrongdoing, but were merely exercising their "business judgment" "consistent with their legal duty to act in the overall business best interests." The master also found that the interest-free loan of $45,000 to Ely was an "executive perk [sic]" which was properly treated by Amoskeag management as part of Ely's compensation. Finally, in regard to Ely's employment contract and other Amoskeag compensation, the master found that the beneficiaries failed to prove that "Ely, with the supporting influence of Buck Dumaine, has caused the Amoskeag Board to improperly and thus illegally endow him with excessive and unreasonable personal financial benefits in denial of the rightful and protected interests of the [beneficiaries]." In reaching this conclusion, the master noted that "[a]n employment contract which permits an executive to retire at age forty-seven is found to be unusual," but not so unusual that it is "legally improper." The master also noted that "[a]lthough Ely held management positions through the entire complex, his compensation . . . is paid entirely by Amoskeag and it is only with Amoskeag that Ely has an employment contract;" that Ely significantly contributed to Amoskeag's success; and that "Ely's employment agreement can be terminated without cause at any time by Amoskeag during its term upon him [sic] receiving ninety days' written notice. . . . This termination right seriously undermines Ely's security under the agreement."

We conclude that a reasonable person could have found as the master did on these matters. On the evidence in this case, although we might not have done so, a reasonable person could have concluded that the yacht transaction between Duxbury and Ely was chiefly for Duxbury's and not Ely's benefit. A reasonable person could also have concluded that the loan and the employment contract were justifiable compensation for Ely's work for Amoskeag and its subsidiaries. Therefore, we will not disturb the master's determinations.

## III. *Other Alleged Breaches of Trust*

The beneficiaries contend that Ely and Buck Dumaine and other Dumaines' trustees breached their trust simply by holding myriad positions in Amoskeag, its subsidiaries, and the various satellite trusts. This argument must also fail. The master noted in his report that, "[i]t is true that certain Dumaines trustees, including Buck Dumaine and Joseph B. Ely, II, served in offices within

the Dumaines corporate complex which can be considered as in conflict of interest with their fiduciary duty of undivided loyalty to the trust." Normally, the existence of such a conflict of interest would amount to a breach of trust. *See generally* C. DeGrandpre, 7 New Hampshire Practice, Wills, Trusts and Gifts § 725, at 301. This case, however, does not involve a "normal" trust. As the master stated, "such positions of conflict are inherent in the declared scheme of the settlor and he entrusted his trustees and managers to exercise their authorities in the overall best interests of the complex and its beneficial recipients." We will not disturb the master's finding on this point, since a reasonable person could have concluded that the settlor intended the trustees of Dumaines to hold positions of authority within Amoskeag and its subsidiaries, thus creating potential conflicts of interest.

The beneficiaries contend that the Dumaines' trustees breached their trust in paying $1,132,514 in management fees to Amoskeag between 1978 and 1982, and that the trustees should be surcharged for the payments. The fees were for investment management advice, and for office, accounting, and clerical services. Dumaines has never maintained its own offices, but has always used those of Amoskeag. The company calculated the fees charged to the trust by employing the New England Merchants National Bank's schedule for determining its trustee charges.

The beneficiaries argue that payment of the fees by Dumaines to Amoskeag is improper for two reasons. First, they argue that use of the bank's fee schedule to set the payments was arbitrary and excessive, since nearly 95% of Dumaines' assets are invested in Amoskeag and related companies and, thus, there is no need for extensive investment management advice. Second, the Amoskeag committee which gave investment advice to Dumaines included among its members two Amoskeag officers who were also Dumaines' trustees and who were thus obligated to manage trust assets without compensation. "A trustee can properly incur expenses in employing attorneys or brokers or other agents or servants so far as such employment is reasonably necessary in the administration of the trust." A. Scott, The Law of Trusts § 188.3, at 1530 (3d ed. 1967).

The master found that under article I, section 8 of the Dumaines indenture, the trustees may elect agents and may compensate such agents for the services they provide the trust. The master concluded:

"That the trustees have authorized and engaged Amoskeag to exercise management, investment and financial responsibilities with regards to the Dumaines' portfolio

and business interests is consistent with their trust powers and the record does not support a finding that this relationship has endured other than in good faith and with due regard for the trustees' fiduciary obligations to the beneficiaries. Amoskeag has managed the Dumaines' portfolio and business interests for approximately forty (40) years. The Trust performance has been commendable and net asset value has grown over tenfold from 1951, the year of the settlor's death, through 1982."

The master found that the New England Merchants Bank trustee fee schedule used by Amoskeag was not "arbitrary or reasonable" but was instead "a formula consistent with the market place" and the resulting "fees charged were less than what might have been charged by others."

We uphold the master's determination. It was reasonable for the master to conclude that the settlor intended Dumaines and Amoskeag to be run as a coordinated financial complex, and that he intended for Dumaines' trustees to operate Amoskeag. It was also reasonable for the master to find that the exchange of payment for management services between the two entities and amount exchanged were reasonable, particularly where Amoskeag is owned 40% by public shareholders.

## IV. *The Dexter Accounting*

The beneficiaries' final arguments on appeal concern the issue of an accounting of the Dexter Trust. The beneficiaries contend that (1) the master erred in not ordering a judicial accounting from the Dexter trustees directly to the beneficiaries of Dumaines; and (2) they should be able to sue derivatively for a judicial accounting of Dexter, in place of the Dumaines' trustees. Finally, the Dumaines' beneficiaries argue in passing that the Dumaines' trustees should, at the very least, share with them the informal accounting they receive periodically from the Dexter Trust.

As noted earlier, when Buck Dumaine, the life tenant of the Dexter Trust, dies, the Dexter assets will be distributed to Dumaines. Thus, the trustees of Dumaines have the vested remainder interests of Dexter, and the Dumaines' beneficiaries have a contingent beneficial interest in Dexter.

We first raise a jurisdictional question *sua sponte* because of our abiding concern for the orderly administration of trusts. We hold that the superior court should have declined jurisdiction over the Dexter and Dumaines' trustees' original petition for declaratory

judgment to the extent that the petition asked the superior court to make a determination of the duties of the Dexter trustees to account to the Dumaines' beneficiaries. Accordingly, we vacate that part of the trial court's decision which relates to the Dexter trustees' duties.

In considering whether a particular court is the proper forum for supervising a trust, three questions need to be addressed: first, does the court have jurisdiction; second, will the court, if it has jurisdiction, exercise or decline to exercise its jurisdiction; and third, if the court exercises its jurisdiction, what effect will its judgment be given in another State? A. SCOTT, THE LAW OF TRUSTS § 564, at 3801 (3d ed. 1967).

There is no doubt that the superior court had *in personam* jurisdiction over both the petitioners and the respondents. The petitioners commenced the action in the superior court, and the respondents elected to bring a countersuit. "Where a proceeding is brought in a court which has jurisdiction over the parties, the court may make a decree binding on the parties personally, even though it has no jurisdiction over the trust property and cannot directly affect the interests of the parties in the property." A. SCOTT, THE LAW OF TRUSTS § 565, at 3803 (3d ed. 1967).

In determining whether the superior court should have exercised or declined to exercise its jurisdiction in this case, we consider the relationships which New Hampshire and Massachusetts have with the Dexter Trust. *See* A. SCOTT, THE LAW OF TRUSTS § 569, at 3811 (3d ed. 1967). New Hampshire's interest in the proper administration of Dexter is substantial because Dumaines, a New Hampshire trust, has the vested remainder interest in Dexter. Nevertheless, we cannot help but conclude that Massachusetts' interest in the administration of Dexter is greater. Both the petitioners and the respondents acknowledge that Dexter is a Massachusetts trust which is administered in Massachusetts, and which is governed by the trust law of that commonwealth. The question we are asked to decided is whether the Dexter trustees need only account to the Dumaines' trustees under the Massachusetts general rule that in matters involving the trust and the outside world the trustees represent the beneficiaries, *see In re Claflin*, 336 Mass. 578, 146 N.E.2d 914 (1958), or whether the Dexter trustees must account directly to the Dumaines' beneficiaries under exceptions to the general rule which govern when certain conflicts of interest exist. *See New England Peabody Home for Crippled Children v. Page*, 325 Mass. 663, 92 N.E.2d 235 (1950); *Azarian v. First National Bank of Boston*, 383 Mass. 492, 423 N.E.2d 749 (1981). It is

our conclusion that the Massachusetts courts, and not those of New Hampshire, are the courts of "primary supervision" over the Dexter Trust and the satellite trusts, and that this question should be left to a Massachusetts court to decide. *See* A. SCOTT, THE LAW OF TRUSTS §§ 571, 572, 573 (3d ed. 1967).

Both New Hampshire and Massachusetts jealously seek to preserve jurisdiction over their own trusts. *See, e.g., Exeter v. Robinson Heirs*, 94 N.H. 463, 55 A.2d 622 (1947); *Fernald v. Church*, 77 N.H. 108, 88 A. 705 (1913); *Greenough v. Osgood*, 235 Mass. 235, 126 N.E. 461 (1920). Both States also willingly decline jurisdiction over another State's trust. *See, e.g., In re Farnsworth's Estate*, 109 N.H. 15, 241 A.2d 204 (1968); *Jenkins v. Lester*, 131 Mass. 355 (1881). *But see In re Estate of Thompson*, 118 N.H. 361, 386 A. 2d 1280 (1978); *Isaacson v. Boston Safe Deposit & Trust Co.*, 325 Mass. 469, 91 N.E.2d 334 (1950); *First National Bank of Mount Dora v. Shawmut Bank of Boston, N.A.*, 378 Mass. 137, 389 N.E.2d 1002 (1979) (all three cases dealing with allocation of estate taxes) (cases discussed in A. SCOTT, THE LAW OF TRUSTS § 576 (3d ed. 1967 (Supp. 1985)). Both practices are sound. Although there is a strong policy favoring an end to litigation, there is an equally strong policy favoring the orderly administration of trusts. As Professor Scott has noted:

> "The administration of a trust is ordinarily governed by law of the state of primary supervision, and the rights of the parties should not be dependent on the fact that a court of some other state happens to have acquired jurisdiction. That court may give a judgment based upon the application of its own local law, or it may attempt to apply the law of the state of primary supervision but mistake that law."

A. SCOTT, THE LAW OF TRUSTS § 573, at 3831–32 (3d ed. 1967).

■■ A final consideration stays our hand from divining the law of Massachusetts in this area; namely, what effect that Commonwealth is likely to give any judgment we might render. "A judgment rendered in one State of the United States need not be recognized or enforced in a sister State if such recognition or enforcement is not required by the national policy of full faith and credit because it would involve an improper interference with important interests of the sister State." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 103 (1971). *See Hanson v. Denckla*, 357 U.S. 235 (1958); *Lewis, et al. v. Hanson, et al.*, 36 Del. Ch. 235, 128 A.2d 819 (Del. 1957); *Hanson v. Denckla*, 100 So. 2d 378 (Fla. 1956). *See generally* A. SCOTT, THE LAW OF TRUSTS § 573 (3d ed. 1967). There

is ample evidence that the Massachusetts Supreme Judicial Court would consider a decision by this court regarding the Dexter trustees' duty to account as improper interference with the Commonwealth's important interests. In the case of *Greenough supra*, the court, in holding that Massachusetts courts had jurisdiction over a trust which the settlor intended to be administered in Massachusetts, noted that its claim of jurisdiction was bolstered "by the further fact that the Massachusetts trustees or trustee could at no time have been compelled to account for the property in trust, in any State other than Massachusetts." *Id.* at 238, 126 N.E. at 462 (citations omitted). In addition, the Massachusetts high court has exercised jurisdiction over the Dexter Trust in the past. *See Dumaine v. Dumaine*, 301 Mass. 214, 16 N.E.2d 625 (1938) (interpreting certain provisions of the Dexter Trust).

Finally, we address the beneficiaries' argument that the Dumaines' trustees have failed in their duty to the beneficiaries relative to seeking accountings. The beneficiaries fault the Dumaines' trustees for refusing to seek, in their role representing the vested remainder interests, a full judicial accounting of the Dexter Trust and claim standing to pursue the matter in the trustees' place. The beneficiaries also argue that they are entitled to have the informal accountings made to Dumaines' trustees by the trustees of Dexter "in order to determine whether the Dumaines trustees have discharged their obligation to ensure that the Dexter trustees properly accounted." These arguments are without merit.

It is clear that the Dumaines' trustees have a duty to safeguard the interests of Dumaines in the Dexter Trust. If the Dexter trustees were to commit a breach of trust that affected the rights of Dumaines, then the Dumaines' trustees would have an affirmative duty to enforce a claim against the Dexter trustees. *See American Fidelity Co. v. Barnard*, 104 N.H. 146, 152–53, 181 A.2d 628, 632 (1962). *See generally* A. SCOTT, THE LAW OF TRUSTS §§ 175, 176, 177 (3d ed. 1967). As between the beneficiaries and the outside world, the trustees represent and protect the beneficiaries' interest. *See* A. SCOTT, THE LAW OF TRUSTS § 282, at 2337 (3d ed. 1967). Unless the trustees commit a breach of trust in not taking action against a third party who does injury to the trust, the beneficiaries cannot bring a suit against the trustees and the third party. *See id.* § 282.1, at 2340.

The master found that the Dumaines' trustees handled their duties regarding receipt and review of the informal accounting from the Dexter Trust and the satellite trusts "in a reasonable and proper manner." The master also found no evidence that the

Dumaines' trustees have ever wrongfully refused to commence an action against the Dexter trustees. We will not disturb the master's findings, since a reasonable person could have so found.

■■■ A trustee of an inter-vivos trust has a duty to keep and to render clear and accurate accounts in a reasonable fashion, *see Katz v. Katz*, 104 N.H. 478, 190 A.2d 425 (1963); *Miller v. Pender*, 93 N.H. 1, 34 A.2d 663; *see generally* A. SCOTT, THE LAW OF TRUSTS § 172 (3d ed. 1967), but is not required to make a regular accounting to the probate court, *see* RSA 564:19 (governing testamentary trusts), although an equity court can order a judicial accounting upon a showing of abuse of discretion. *See* RESTATEMENT (SECOND) OF TRUSTS § 172 comment (d) (1959).

■■■ The master found that "[t]he accounting statements furnished by Dumaines [to the beneficiaries] reflect all items of income and expense, profit and loss, a list of assets and a balance sheet. The statements and accounts have been consistently audited by independent auditors and no auditor's report has ever been qualified. The evidence supports a finding that there has been no bad faith or wrong-doing with regard to the furnishing of these accounts and I find that they are judicially sufficient." The master also noted that "objections as to the form of these accountings have not been made by beneficiaries including Pierre ["Spike" Dumaine] who was the treasurer of Dumaines for a period of approximately eight years." We see no reason to disturb these findings.

*Affirmed in part; vacated in part.*

All concurred.