[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 719 
OPINION
Testamentary cotrustees, Fred M. Yasukochi and John P. Armstrong, appeal from provisions of a judgment surcharging *Page 720 
them $133,876.50, which amount represents the adjusted difference between the total of the annual bonuses paid or credited to Yasukochi by Ramirez and Feraud Chili Company (hereafter Company) for six years (1971-1972 to 1976-1977, inclusive), and 10 percent of the Company's net income after taxes for the same period.
The principal issues presented by this appeal are whether the corporate bonuses paid trustee Yasukochi were fair and reasonable and whether trustee Armstrong was properly held liable for the surcharge. More specifically, the two trustees contend that (1) the trial court should have applied a corporate standard rather than a trust standard in evaluating the reasonableness of Yasukochi's bonuses for successfully managing an estate corporation; (2) the evidence in support of the finding of unreasonableness with respect to Yasukochi's bonuses is insubstantial; and (3) Armstrong was improperly surcharged without either findings or evidence that he either consented to Yasukochi's bonuses or negligently enabled them to be paid or credited. (See Civ. Code, § 2239)
For reasons that follow, we have decided to reverse the surcharge order for the sole purpose of a further evidentiary hearing upon what would be fair and reasonable bonuses to Trustee Yasukochi for the period in question.
 FACTS
The decedent, Ernest C. Feraud, at the time of his death in 1966, owned all of the outstanding stock of the Company, a California corporation. Yasukochi at that time was vice president of the Company and in charge of its operations whenever the decedent was unavailable. Since that time Yasukochi has been the president and chief operating officer of the Company as well as one of its directors. Armstrong is a public accountant who, for many years prior to the decedent's death, did the outside accounting work for the Company. He has been the secretary-treasurer of the Company since approximately 1965 and a director as well since approximately 1970. The decedent named Yasukochi and Armstrong in his last will as coexecutors of his estate and as cotrustees of the testamentary trusts created by the will. As such trustees they became the sole owners of all the stock of the Company. Yasukochi, since the decedent's death, has been the only full-time officer of the Company and has personally handled the entire management of both production and sales including, as incident thereto, labor relations and finance. *Page 721 
As the sole stockholders, Yasukochi and Armstrong controlled the Company and selected three other businessmen from Ventura to constitute with them the five-person board of directors. In June 1971 two of these three outside directors were appointed by the board of directors to study, at Yasukochi's request, the matter of providing him with incentive compensation. At the board of directors meeting the following month, these three directors passed a motion by one of them (with Yasukochi and Armstrong abstaining) that beginning July 1, 1971, Yasukochi's compensation would be his existing salary of $30,000 a year (which had remained unchanged since the decedent's death) plus 2 percent of gross sales (after the deduction of promotional rebates and discounts and the income from the sale of raw products, by-products and miscellaneous items) to the extent that these sales exceeded $1.5 million per year.[1]
Decedent's last will created three trusts. Twenty percent of the stock of the Company was allocated equally to two separate trusts for two stepchildren of the decedent. The remaining 80 percent of the stock was allocated to the residuary trust. The three life beneficiaries of the net income of this trust were the decedent's three adult daughters and the remainder interest of this trust was owned by their issue. The stock of the Company constituted over 90 percent of the fair market value of the residuary trust.
This litigation began with the filing on June 13, 1977, of exceptions to the sixth account of the cotrustees that covered the fiscal year 1975-1976, by two of the three life-income beneficiaries of the residuary trust. These same objectors also filed objections on September 7, 1977, to the trustees' seventh account covering the period of September 1, 1976 to July 31, 1977.
The annual accounts, which Yasukochi and Armstrong submitted to the probate court as testamentary trustees starting in 1968, contained nothing about the Company's situation and operations except statements of the total dividends declared by the Company and the trustees' estimates of the market values of the Company's stock. On May 31, 1977, the two trustees, however, submitted to the probate court with their petition to the court for instructions regarding the trusts' retention of the Company's stock and the Company's dividend policy, a statement of the financial position of the Company as of June 30, 1976, and a comparative statement of the income of the Company for the years ending June 30, 1975 and June 30, 1976. *Page 722 
Under the incentive compensation plan adopted in July 1971, Yasukochi received $262,841.13 in bonuses for the six fiscal years 1972 through 1977 ending June 30. The trial court found this bonus of 2 percent of essentially gross sales of the Company to be "grossly unfair to the beneficiaries" and unreasonable and that a reasonable bonus for Yasukochi for these years would be 10 percent of the Company's net income after taxes or a total for this period of $118,713.33.[2]
During the six years in question, the Company's gross sales went from $2,284,383 to $5,621,720. Yasukochi's annual bonus, which was based essentially on the annual gross sales in excess of $1.5 million, steadily rose during this period from $14,611.95 to $74,476.02. During this same period, the Company's earnings increased correspondingly — that is, from $64,926 to $381,053, but Yasukochi's bonuses ascended in amount invariably with the increase in the gross sales of the Company, while the Company's net income after taxes dropped one year and remained much the same two years out of the six. In addition, comparatively little of the net income of the Company was distributed to the life-income beneficiaries in dividends because Yasukochi and Armstrong followed a policy of retention of earnings in order to modernize the Company's facilities, expand its sales and strengthen its competitive position.[3]
 DISCUSSION
We are concerned here only with the legal propriety of a testamentary trustee's compensation where such compensation has not been fixed in the decedent's will. Probate Code section 1122 states that such a trustee "shall be entitled to such compensation as may be reasonable under the circumstances." The trustees contend that the proper measure of such reasonableness is found in Corporations Code section 310, subdivision (a)(2), which deals with the validity of transactions between a corporation and a director in which the director has a material financial interest. Among the requirements stated in this subdivision for the validity of such a transaction is that the transaction must be "just and reasonable as to the corporation at the time it is authorized." *Page 723 
(1) We do not agree that this particular corporate standard of reasonableness is the correct one to apply to Yasukochi's incentive compensation under the circumstances of this case. In the first place, it applies but once — when the transaction is authorized. The reasonableness of a testamentary trustee's compensation is a continuing responsibility of the trustee throughout his entire tenure. Secondly, the beneficial owners of the stock of the corporation in this case were the beneficiaries of the three trusts. Yasukochi's bonuses had to be fair and reasonable as to them and not as to the corporation, which was simply the device through which the affairs of the three trusts were largely conducted. (2) Yasukochi was under a duty to these beneficiaries to administer the three trusts, including their principal asset, the Company, solely in their interests (Rest.2d Trusts, § 170, subd. (1); see also Scott on Trusts (3d ed. 1967) § 193.2, p. 1598), to use reasonable care and skill to make the trust property productive (Rest.2d Trusts, § 181), and to pay the net income of the various trusts to the beneficiaries thereof. (Id., § 182.) The vice of Yasukochi's arrangement for incentive compensation from the Company was that it was geared exclusively to gross sales and not at all to net profits, which was the primary concern of the life-income beneficiaries of the three trusts. (Cf. id., § 242, com. (c).) As the objectors' sole expert witness somewhat more generally opined, it was this total lack of connection between the amounts of Yasukochi's yearly bonuses and the Company's yearly net profits that made his bonuses unfair and unreasonable, at least with respect to the life-income beneficiaries. This circumstance in and of itself constitutes substantial evidence in support of the trial court's finding of unfairness and unreasonableness.
(3) We cannot, however, affirm the challenged surcharge order. There is no evidentiary support at all in the record before us for the legal correctness of the measure of incentive compensation which the trial court chose — namely, 10 percent of the Company's net income after taxes. This measure may be legally correct, but such correctness must be demonstrated by relevant evidence. The fact that Yasukochi's corporate compensation under it for the years in question amounted to about $50,000 a year does not in itself legally justify it.
(4) We turn now to the failure of the trial court to find expressly that the payment of the annual bonuses in question to Yasukochi was either consented to by Armstrong or occurred by reason of his negligence. There is nothing in the record indicating any affirmative consent on Armstrong's part to these bonuses and we are not disposed to hold that for the purpose of Civil Code section 2239 mere acquiescence constitutes consent. On the other hand, we believe that the record does show the requisite negligence *Page 724 
on Armstrong's part. Armstrong is and, at all times relevant to this litigation, was a public accountant and he, of all people, should have been aware that an arrangement for the incentive compensation of a corporate manager of a business, which is totally unrelated to the net income of the corporation, must be deemed unfair and unreasonable to the beneficial owners of the stock of the corporation — namely, in this case the beneficiaries of the three trusts, and particularly the life-income beneficiaries thereof. An appropriate finding of this negligence on Armstrong's part should have been made, but this error is harmless since such a finding, if it had been made, would of necessity have been adverse to Armstrong. (See 6 Witkin, pt. I, Cal. Procedure (2d ed. 1971) Appeal, § 308, p. 4289.)
 DISPOSITION
The provisions of the judgment under appeal specifying the surcharge order are reversed for further proceedings limited to establishing what a fair and reasonable measure of incentive compensation of Trustee Yasukochi for the years in question should be and the resulting surcharge order, if any. Otherwise the judgment is affirmed. Costs on appeal shall be borne by the parties incurring them.
Allport, J., and Potter, J., concurred.
[1] The Company's gross sales for the fiscal year ending June 30, 1971, were $1,967,330.
[2] The difference between the total of the court-specified bonuses and the bonuses Yasukochi actually received is $144,127.80. The trial court credited against this difference $10,251.30 as the net amount of trustees' fees due the two trustees after deduction of Armstrong's unpaid indebtedness to the Company.
[3] This policy of retention of earnings, of course, favored the remaindermen over the life-income beneficiaries, but these groups have apparently settled their differences. *Page 725