In the Matter of the Receivership of MT. PLEASANT BANK AND TRUST COMPANY, Mt. Pleasant, Iowa

Re Garland CARVER, Successor Trustee for City of Mt. Pleasant, Iowa, Industrial Development Revenue Bond Issue (SAI Project) and City of Gilman, Iowa, Industrial Development Revenue Bond Issue (SAI Project), Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of the Mt. Pleasant Bank and Trust Company; and Centerre Bank, N.A. f/k/a First National Bank in St. Louis, Appellees.

No. 89–643.

Supreme Court of Iowa.

April 18, 1990.
Rehearing Denied May 23, 1990.

Mark E. Schantz and Jon P. Sullivan of Dickinson, Throckmorton, Parker, Mannheimer & Raife, P.C., Des Moines, for appellants.

Michael Noyes and Patrick J. Flynn of Stanley, Rehling & Lande, P.C., Davenport, Ann S. DuRoss, Asst. Gen. Counsel, and Sharon Powers Sivertsen, Washington, D.C., for appellee FDIC.

F.L. Burnette II and Randall G. Horstmann of Nyemaster, Goode, McLaughlin, Voigts, West, Hansell & O'Brien, P.C., Des Moines, for appellee Centerre Bank.

Considered by HARRIS, P.J., and SCHULTZ, CARTER, SNELL, and ANDREASEN, JJ.

HARRIS, Justice.

A failed bank had served as trustee for bondholders who invested in a local industry. A successor trustee brought this equity action against the bank and a second bank which participated in loaning funds to the industry. The action is based on theories of breach of fiduciary duty. The district court ruled in favor of plaintiff trustee and fashioned a remedy intended to restore the parties to the status quo prior to the breach of fiduciary duty. We affirm in part, reverse in part, and remand for further proceedings.

On our de novo review we reach the same factual findings as those found by the district court. Except as they relate to the extent of participation by the second bank, a matter vigorously contested, they are to a considerable extent undisputed. SAI, an Iowa corporation with main offices at Mt. Pleasant, produced insulation material. It had three subsidiaries, one at Gilman, Iowa, and two at Mt. Pleasant.

SAI relied on two industrial development bonds to acquire facilities in both towns. The City of Mt. Pleasant issued $1 million in bonds to finance construction of a local facility. The City of Gilman issued $1 million in bonds for purchase of an existing facility there. The bonds were to be retired over a period of fifteen years in semiannual installments. The bonds in each case were secured by the facilities for which they were issued.

The Mt. Pleasant Bank & Trust Co. (Mt. Pleasant Bank) executed indentures of trust with each city, under which it undertook to act as trustee for the loans by both cities to SAI and its subsidiaries. By the indenture Mt. Pleasant Bank was assigned and accepted the rights of each city to enforce the terms of each bond loan.

SAI also borrowed money for operating capital. Term and credit loans for this purpose were provided by two banks acting jointly: Mt. Pleasant Bank and Centerre Bank of St. Louis (formerly known as the First National Bank of St. Louis). Mt. Pleasant loaned SAI $1 million for this purpose; Centerre loaned $1,500,000.

Mt. Pleasant Bank executed a participation agreement with Centerre in connection with the joint bank loans whereby Mt. Pleasant Bank agreed to service and collect the bank loans for itself and as agent for Centerre. Mt. Pleasant Bank was thus responsible for the collection of both its own and Centerre's loan to SAI, and at the same time also owed the bondholders a fiduciary duty to collect the SAI bond loans.

This litigation stems from tension from these conflicting duties. Plaintiffs allege Mt. Pleasant Bank—with Centerre's participation—acted to favor collecting SAI's debt for operating capital by sacrificing the interests of the bondholders.

Plaintiffs' claim became apparent after August 6, 1982, when Mt. Pleasant Bank

was ordered closed and went into receivership. The federal deposit insurance corporation (FDIC) was appointed receiver. Garland Carver was thereafter appointed successor trustee for the bondholders and later brought this action. For clarity we hereafter refer to the plaintiff trustee as the bondholders.

Severe economic losses for the fiscal year ending June 30, 1979 ($1,756,960 pretax loss; $929,260 after tax loss; and $1,375,597 loss in working capital) placed SAI in breach of various financial covenants in its bank loan agreement. To prevent these defaults from being noted in SAI's annual audit Mt. Pleasant Bank and Centerre waived the defaults by letter. No mention of the losses by SAI, or the default they caused under SAI's bank loans, was made to any of the bondholders.

Because of increasing concern over SAI's deteriorating financial condition Centerre closely monitored the operation. A Centerre loan officer was often in Mt. Pleasant in late 1979 and early 1980 and knew the Mt. Pleasant facility had never been profitable and was then closed down. At this point Centerre took the lead from Mt. Pleasant Bank in their joint efforts to collect the bank loans.

The extent of Centerre's aggressive leadership in this effort is crucial to the bondholders' recovery. As will be hereafter explained, Centerre's liability to the bondholders hinges on its participation in the exploitation of Mt. Pleasant Bank's fiduciary status.

SAI's fiscal year ending June 30, 1980, showed continuing financial deterioration. On July 30, 1980, Centerre notified both SAI and Mt. Pleasant Bank that Mt. Pleasant and Centerre's credit loan would not be renewed when it became due September 30, 1980, and that the balance of the term loan would also then be due. Centerre's call of the loans was based on SAI's deteriorating financial condition; no interest or principal payments had been missed. The loan call was decided by Centerre; Mt. Pleasant Bank went along with reluctance. Nothing was done to notify bondholders of SAI's plight. Notwithstanding Mt. Pleasant Bank's growing conflict of interest it did not withdraw as trustee.

However justified it may have been as a sound banking practice, the decision to call the bank loan was eventually fatal to SAI's operation. It cut off SAI's sole source of credit for its day-to-day operations. The closing down of operations was long delayed, however, because the banks jointly agreed to forbear notifying SAI's account debtors to make receivable payments directly to the banks. The banks agreed to, and did, delay this action from July 30, 1980, until the spring of 1983. When notifications were finally given to the creditors in 1983 SAI promptly filed for chapter eleven bankruptcy.

The bondholders were hurt by this delay. Real estate taxes on the secured property went unpaid, a violation of the loan agreements with the cities. The position of the banks improved relative to that of the bondholders. The banks used this time to obtain any unencumbered SAI assets. The banks demanded and SAI granted a security interest in all SAI's general intangibles which had been previously unencumbered. These included a 1980 income tax refund (asserted to be $125,000) and a stock option (asserted to be $695,331). Rolling stock in the form of tractor-trailer units was also liquidated and paid to the bank. During much of this time the bondholders were deterred from moving to protect themselves by the banks' conduct. The importance to the bondholders of doing so was concealed because SAI, notwithstanding its plummeting condition, was allowed to come up with scheduled bond payments while the banks obtained the unencumbered assets.

When SAI was late in making its bond payment due November 1, 1981 (notwithstanding loans by the banks which ultimately enabled SAI to make this payment) a notice was finally sent to the half dozen bondholders for whom the Mt. Pleasant Bank had an address. The notice purported to advise the Gilman bondholders that the payment due "September 1, 1981 [1982?]" was not made by SAI. Although the letter was dated October 30, 1981, it was not mailed until November 2, 1981.

And before it was mailed the following notation was added at the bottom: "Received payment for bonds and coupons on 11-2-81."

Three inquiries resulted from this handful of notices. Bondholders requesting information were assured by Mt. Pleasant Bank that payments owing on the issue had been received and the trustee expected "no problem with future payments."

Mt. Pleasant Bank even declined to act when advised by its counsel in January 1982 to resign as trustee for one or both of the bond issues because of its irreconcilable conflict of interest. A letter of resignation regarding the Gilman bond issue was drafted but was never mailed.

SAI did not make any of the payments required under the bond loans in the spring of 1982. It failed to make the payments of interest on the Mt. Pleasant and Gilman bond issues due on March 1, 1982, and May 1, 1982. It failed to pay real estate taxes due in March.

Mt. Pleasant Bank took money from special escrow reserve funds which the bank held as additional collateral for payment of the bonds and used it to make the payments to the bondholders which were due in March and May of 1982. No notice of any kind was given the bondholders regarding SAI's failure to make the required payments.

In August of 1982 Mt. Pleasant Bank was, as mentioned, closed and the FDIC was appointed as its receiver. When SAI failed to make its bond payments in the fall of 1982 the FDIC again utilized the special escrow reserve funds still on deposit to make interest payments to the bondholders but was prohibited by the trust indenture from using these funds to make principal payments. The FDIC as receiver of the Mt. Pleasant Bank mailed a notice of default under the bond loans to SAI. No other action was taken with respect to collection of the bond loans or foreclosure of the collateral securing the loans.

Finally, on September 23, 1983, Centerre offset the balances then on deposit in SAI's checking account at Centerre and reminded SAI in a letter that Centerre had twice, on August 3, 1980, and on June 21, 1982, demanded "payment in full" of the bank loans. Centerre's notification to SAI's account receivable debtors forced the chapter eleven bankruptcy proceeding previously mentioned. More than one year had passed since the date the banks took their security interest in the acquisition of the stock option. Because one year had passed the security interests could not be voided by a bankruptcy trustee as preferential transfers under 11 U.S.C. section 547 or as fraudulent conveyances under 11 U.S.C. section 548.

Between SAI's default on the bank loans and the bankruptcy petition the banks collected $792,634.98 from SAI. Both banks benefited from these payments. Centerre received cash payments and Mt. Pleasant Bank benefited because each payment to Centerre increased Mt. Pleasant Bank's percentage interest in the remaining loan balance. No effort was made by either bank to segregate the payments received by way of liquidation of original collateral from payments received from additional collateral procured from SAI.

Mt. Pleasant Bank and Centerre each received payments from SAI's bankruptcy estate. These payments included proceeds from the additional collateral procured from SAI in the spring of 1981.

We agree with the district court finding that, when Centerre realized early in 1980 that SAI was in trouble, it became more actively involved in supervising and directing the loans. The two banks' subsequent efforts to seize security for their own loans, sacrificing the interests of the bondholders, was at Centerre's urging and with its direct participation. This participation was undertaken with full knowledge of Mt. Pleasant Bank's fiduciary status and consequent duty to represent and protect the interests of the bondholders. Centerre participated in exploiting the bondholders through Mt. Pleasant Bank's fiduciary status.

I. We have often held that one who is under a fiduciary relationship to another is bound to a high standard of

good faith and cannot profit from the relationship beyond the agreed compensation. *See e.g. Wormhoudt Lumber Co. of Ottumwa v. Cloyd*, 219 N.W.2d 543, 545 (Iowa 1974). A trustee or fiduciary[1] is under a duty to communicate to the person to whom the duty is owed all known material facts or those material facts which should be known. Restatement (Second) of Trusts § 170(2).

Centerre does not challenge this black-letter rule but insists the case against it is based, not on primary, but secondary liability. *See Metge v. Baehler*, 762 F.2d 621, 624 (8th Cir.1985). Centerre believes that secondary liability requires more knowledge and participation in the breach than occurred here. The contention is answered by the findings of fact we have related, which do not square with those proposed by Centerre.

It goes almost without saying that Centerre forcefully disputes the finding that it participated with Mt. Pleasant Bank to the extent we have found. Centerre insists it was not in legion with Mt. Pleasant Bank so far as trustee activities were concerned, "that its conduct in trying to collect its own loan on its own collateral, and leaving Mt. Pleasant Bank to tend to its fiduciary duties [was] not culpable but commercially reasonable in the marketplace." Centerre cites cases which hold that a creditor is under no fiduciary obligation to the debtor or other creditors, is in fact in fair competition with other creditors. *See e.g. Crowder v. Allen–West Comm'n Co.*, 213 F. 177, 184 (8th Cir.1914).

Centerre loses the point, not on the law, but on the facts. We have found that Centerre did not go about collecting this loan as just another creditor. It began by sharing responsibilities and collecting the loans with Mt. Pleasant Bank, then gained ascendancy in the relationship, and ended by taking full advantage of Mt. Pleasant Bank's fiduciary status. Such involvement distinguishes this case from those which allow lending institutions as a matter of

prudent banking practice to proceed with vigor to collect in competition with other creditors.

The controlling rule is perhaps best stated in Restatement (Second) of Trusts section 326:

> A third person who, although not a transferee of trust property, has notice that a trustee is committing a breach of trust and participates therein is liable to the beneficiary for any loss caused by the breach of trust.

We think Centerre's liability to the bondholders is clear.

II. The district court's remedy for the bondholders was intended to reestablish them in the relative position existing before any breach of loyalty occurred. To accomplish this the court first computed the bondholders' pro rata share ($1,875,000) of SAI's total indebtedness ($3,172,000) at fifty-nine percent. Second the court found the amount improperly received by the banks from SAI's collateral to be $235,000 (an amount the bondholders dispute on appeal). The district court then allowed the bondholders fifty-nine percent of the $235,000, or $138,650. The bondholders attack the damage award as inadequate on two fronts. They first challenge the premise that the bondholders' recovery should be limited to mere restoration of the parties, contending the banks should be penalized rather than restored. The bondholders also dispute the district court finding which fixed at $235,000 the amount of securities improperly obtained by the bank.

III. The bondholders cite a number of authorities to support the theory that recovery should be fixed so as to make it unprofitable for fiduciaries to breach their duties. *See Miller v. Berkoski*, 297 N.W.2d 334, 341 (Iowa 1980); *Wormhoudt Lumber*, 219 N.W.2d at 546.

We agree with the district court that Centerre's conduct does not call for punitive-type damages. Punitive damages are never awarded as a matter of right.

---

1. Trust principles apply in fiduciary or confidential relationships. *See* Restatement (Second) of Trusts § 2 comment b.

Even in deliberate breach-of-contract cases the breach, standing alone, is insufficient to support a punitive damage award. *Berryhill v. Hatt*, 428 N.W.2d 647, 656 (Iowa 1988). We agree with the district court's refusal to allow recovery in an amount which would punish the banks.

■ IV. A more difficult problem is presented by the bondholders' challenge to the finding limiting the amount of securities obtained by the banks to $235,000. Undergirding this challenge is a complaint with respect to placing the burden of proof. The district court assigned that burden to the bondholders, a matter they vigorously protest on appeal. As the bondholders point out the burden of proof is critical.

■ Although the burden-of-proof issue in this case is not without difficulties, the general rule is certainly plain. Where a fiduciary is in a position to take advantage over a principal, especially when the fiduciary has closer access to the facts, the burden "shifts to the fiduciary to show fair dealing in all matters within the fiduciary obligation." *Clinton Land Co. v. M/S Assocs., Inc.*, 340 N.W.2d 232, 233 (Iowa 1983). The key is access to the proof; the burden of proof ordinarily rests on the party who possesses the facts on the issue in dispute. *See Haynes v. Dairyland Mut. Ins. Co.*, 199 N.W.2d 83–85 (Iowa 1972).

Mt. Pleasant Bank became a fiduciary by written agreement. Centerre becomes obligated because of its participation with Mt. Pleasant Bank. Centerre undoubtedly has possession of fewer facts than Mt. Pleasant Bank but more facts than the bondholders. Under these unusual circumstances we think the burden should shift to Centerre only as to those matters with respect to which it has been shown Centerre holds specific knowledge.

From our review of the record we agree with the district court's conclusion that Centerre should be charged with profiting from the tax refund previously mentioned and agree with the district court assess-

ment fixing the value of it at $80,000. We also agree with the district court's conclusion that Centerre should be charged with profiting from the stock option previously mentioned and with the district court's assessment fixing its value at $155,000. To these amounts should be added two additional amounts: an additional amount received on the stock option from SAI's bankruptcy plan for reorganization which we find should be valued at $61,000; and rolling stock which we find should be valued at $100,000, a total of $396,000. We agree with the district court that the bondholders' share of the amount should be fifty-nine percent, or $233,640. Judgment should be entered in that amount.

■ V. The district court allowed interest on the judgment against Centerre but limited it to commence from the date the petition was amended to join Centerre as a party defendant. The bondholders argue that interest on the judgment should run from the time the action was commenced against the other defendants, a position they contend is called for by the plain wording of Iowa Code section 535.3 (1989). *See Bernier v. Boston Edison Co.*, 380 Mass. 372, 387–89, 403 N.E.2d 391, 401 (1980).

Confusion persists about the running of interest on judgments. We discussed the controlling rules in *Coachmen Industries, Inc. v. Security Trust and Savings Bank*, 329 N.W.2d 648, 650–51 (Iowa 1983), and again in *Midwest Management Corp. v. Stephens*, 353 N.W.2d 76, 82–83 (Iowa 1984). Two statutes are involved: Iowa Code sections 535.2(1)(b) (general statute for money due sets rate at five percent) and 535.3 (interest on judgments fixed at ten percent).[2]

Where there is a breach of fiduciary duty the aggrieved party is entitled to prejudgment five percent interest under section 535.2(1)(b) from the dates the funds were improperly diverted. *Midwest Management Corp.*, 353 N.W.2d at 81. It runs at five percent until the date the suit is filed

---

2. Section 535.3 provides in material part that [i]nterest shall be allowed on all money due on judgments and decrees of courts at the rate of ten percent per annum.... The interest shall accrue from the date of the commencement of the action.

against them. Because of the allowance of prefiling interest under section 535.2(1)(b), we think it is inappropriate to call for application of section 535.3 until the party charged is actually brought into the suit. Prefiling interest thus accrued is to be added to the amount later awarded as judgment. The sum is to draw interest under section 535.3 at the rate of ten percent from the time papers were filed (in this case against Centerre) until paid.

Upon remand interest should be computed in accordance with this opinion.

▪ VI. The bondholders brought the direct appeal to challenge the damage award. Centerre cross-appealed to challenge any award. FDIC cross-appealed to challenge any award against Mt. Pleasant Bank. The district court correctly ruled that there is no liability against FDIC in its corporate capacity. *See Batsakis v. Federal Deposit Ins. Corp.*, 670 F.Supp. 749, 753 (W.D.Mich.1987). We reverse and remand on the appeal. We affirm on the cross-appeal.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.