**In the Matter of the ESTATE OF Gene Harold SNAPP, Deceased.**

**Carol D. BARRON, Beneficiary, Appellant/Cross–Appellee,**

v.

**Gene H. SNAPP, Jr., Executor of the Estate of Gene Harold Snapp, Deceased, Appellee/Cross–Appellant.**

**No. 92–634.**

Court of Appeals of Iowa.

May 4, 1993.

Robert N. Downer and Timothy J. Krumm of Meardon, Sueppel, Downer & Hayes, Iowa City, for appellant/cross-appellee.

Dean C. Mohr, John A. Templer, Jr., and Ronni F. Begleiter of Shearer, Templer, Pingel & Kaplan, P.C., West Des Moines, for appellee/cross-appellant.

Heard by OXBERGER, C.J., and SACKETT and HABHAB, JJ.

OXBERGER, Chief Judge.

Gene H. Snapp, Sr., died testate on May 31, 1981. Prior to his death, he operated a car leasing business. He organized his business into three corporate entities: Acme Leasing Company; Transit, Inc.; and Blackhawk Rental Company. Blackhawk was a wholly-owned subsidiary of Acme. Gene Sr. owned approximately forty percent of the issued and outstanding stock of Acme and approximately ninety percent of the issued and outstanding stock of Transit. According to the probate inventory, his stock interests in these closely-held corporations was worth a total of approximately $400,000.

Gene Sr.'s will was admitted into probate and his son, Gene Jr., was appointed as executor. The will gave Gene Jr. the authority to operate the car leasing businesses without any liability to any of the beneficiaries. The will also contained a pour-over provision, whereby the residue of his estate would be distributed pursuant to the terms of the Gene Harold Snapp Trust Agreement. This trust created a life estate for the benefit of Gene Sr.'s surviving spouse, Elaine, with equal remainder shares to Gene Sr.'s children. Gene Jr. and the Davenport Bank & Trust are the cotrustees of the trust.

Gene Jr. is an attorney and certified public accountant. He drafted his father's will and trust agreement and has served as both executor and attorney for his father's estate. Upon the death of Gene Sr., Gene Jr. took over as president of Acme, Transit, and Blackhawk. He also took over the day-to-day operations of the businesses with the intent to liquidate them over the next four to five years. During the time period from Gene Sr.'s death until liquidation of the companies, Gene Jr. performed services for the corporations, both in his capacity as an attorney/CPA and as president of the companies.

Carol D. Barron is the daughter of Gene Sr. and the half-sister of Gene Jr. Prior to the filing of this action, Carol filed a petition for declaratory judgment against Gene Jr., both individually and as executor, and other interested parties. Carol sought a determination that she was a child of Gene Sr. and, as such, beneficiary under the terms of the trust. Following trial, the court ruled in Carol's favor. The court's ruling included references to Gene Jr.'s efforts as executor of his father's estate and the distributions he made to himself. The court stated "[Gene Jr.] has been very well paid for his efforts and it appears he earned the payment." Carol filed a rule 179(b) motion asking the court to delete these references. The motion was overruled.

On July 17, 1991, Gene Jr., filed his first and final report and application for discharge from his duties as executor. The final report indicated Gene Jr. collected executor fees of $20,141, attorney fees of $29,179, and compensation for the management of the car leasing companies in the amount of $474,768. He also filed a separate application for an allowance for extraordinary services in which he asked for an additional $5670. Carol filed objections to the first and final report and a resistance to the application for extraordinary

services. Carol claimed Gene Jr. had engaged in self-dealing by paying himself excessive fees and salaries.

Prior to trial, Carol requested the production of various documents, including Gene Jr.'s personal income tax returns for 1979 through 1990. The district court denied the request. Carol served Gene Jr. with a subpoena duces tecum for his income tax returns and other documents. On the day of trial, the court sustained Gene Jr.'s motion to quash the subpoena.

Following trial, the district court determined Gene Jr. did not engage in self-dealing. The court found, given the "magnitude" of work and effort required of Gene Jr., the salaries he paid to himself were reasonable. The court also found his attorney fees were "more than justified" and concluded the extraordinary fees should be allowed. However, the court ordered Gene Jr. to return approximately $80,000 which was labeled an "advance distribution." Finally, the court accepted the final report as modified and discharged Gene Jr. from his responsibilities as executor. Carol appeals and Gene Jr. cross-appeals.

### Scope of Review.

■ This appeal involves a challenge to the district court's approval of the final report of the executor of Snapp's estate. A hearing on objections to a fiduciary's final report is an equitable proceeding, Iowa Code section 633.33 (1991); thus, our scope of review is de novo. *In re Estate of Johnson*, 387 N.W.2d 329, 332 (Iowa 1986).

## I. Burdens of Proof and Persuasion.

■ Carol contends Gene breached his fiduciary duty by engaging in self-dealing. When violations of fiduciary duty are the subject of controversy, the fiduciary "must establish he properly discharged his obligation." *Clinton Land Co. v. M/S Associates, Inc.*, 340 N.W.2d 232, 234 (Iowa 1983). While the burden does not shift automatically, the burden of persuasion shifts to the fiduciary when "there is *some indication* of self-dealing by the fiduciary or when the fiduciary is sued for an accounting of en-

trusted funds." *Id.* at 235 (citations omitted) (emphasis supplied).

In addition:

Where a fiduciary is in a position to take advantage over a principal, especially when one fiduciary has closer access to the facts, the burden shifts to the fiduciary to show fair dealing in all matters within the fiduciary obligation. The key is the access to the proof, the burden of proof ordinarily rests on the party who possesses the facts on the issue in dispute.

*In re Mt. Pleasant Bank and Trust Co.*, 455 N.W.2d 680, 685 (Iowa 1990).

■ The undisputed facts of this case indicate Gene appointed himself president of his father's companies following his father's death. He received compensation considerably in excess of the salary received by his father in the same capacity. Gene also paid himself executor and attorney fees in excess of the maximum amount allowed by statute. Gene paid himself compensation for executor fees, attorney fees, estate distributions, and corporate salaries in excess of $600,000 prior to his application for approval. Most of the payments were made in years 1981–1986, although Gene did not request court approval for compensation until 1991.

We find these facts sufficient to show "some indication" of self-dealing. In addition, Gene is in a much better position to provide the facts necessary to resolve the issues in dispute. Accordingly, we hold Gene carries the burden of persuasion regarding whether he properly discharged his fiduciary obligations.

## II. Allegations of Self-Dealing.

Carol contends the trial court erred in refusing to find Gene Jr. engaged in self-dealing. Specifically, she contends his appointment of himself as president of his father's companies and subsequent receipt of salaries in excess of those received by his father constitute self-dealing.

Resolution of this issue involves a two-part inquiry. We must first examine whether Gene's employment of himself as president of his father's companies was

permitted under the terms of the will. We must then determine whether Gene's conduct constituted self-dealing. If we determine Gene Jr. engaged in self-dealing by receiving compensation for managing the corporations, the burden shifts to Gene to show his compensation was reasonable.

Gene Sr.'s will provides, in relevant part, the following:

I empower my Executor and his successors in their absolute discretion:

1. To hold, manage ... any property of my estate for such consideration and upon such terms and conditions as they may deem advisable.

\* \* \* \* \* \*

4. [P]ay out of income all ordinary expenses incident to the management and preservation of my estate ... and reasonable compensation for fiduciary services, and to pay out of principal any expenses which they deem extraordinary ...

5. [T]o operate any business in which my estate may have an interest with full power of incorporation, sale or lease (without any liability to any beneficiary for any operational losses.).

6. To employ such ... legal counsel, agents or other persons (and act without liability upon the opinions of such ... legal counsel)....

\* \* \* \* \* \*

Each of the foregoing powers of this Article VII shall at all times be exercisable without statutory restrictions of any kind and free from any obligation first to apply for or report to or obtain the approval of any court.

■ We find the inclusion of such terms as "to manage any property", "[t]o operate any business", and "to employ such agents", sufficient to allow Gene Jr. to employ anyone, including himself, to manage the corporations. We thus turn to the remaining part of our inquiry.

■ We now examine whether Gene Jr.'s conduct constituted self-dealing. Germane to this analysis is examination of whether will provisions may violate the statutory prohibition against self-dealing: i.e. whether Gene's conduct was "excused" or permitted under the terms of this particular will.

At the outset, we note self-dealing, without prior court approval, is generally prohibited by the Iowa Probate Code. Iowa Code section 633.155, in pertinent part, provides:

No fiduciary shall in any manner deal with himself, except on order of court after notice to all interested parties, and shall derive no profit other than his distributive share in the estate from the sale or liquidation of any property belonging to the estate.

■ Self-dealing involves those situations in which a fiduciary personally profits from transactions between himself and the estate and is defined as follows:

Relates to transactions wherein a trustee, acting for himself and also as "trustee", a relation which demands strict fidelity to others, seeks to consummate a deal where in self-interest is opposed to duty.

Black's Law Dictionary, (6th ed. 1990).

■ In limited cases, self-dealing may be permitted. Iowa Code section 633.155, noted above, allows self-dealing with prior court approval following notice to all interested parties. Aside from the statutory provision permitting self-dealing with prior court approval, a testamentary instrument may also permit some self-dealing transactions. *See, e.g., Coster v. Crookham,* 468 N.W.2d 802, 810 (1991); *Harvey v. Leonard,* 268 N.W.2d 504, 512–13 (Iowa 1978). Generally, however, clauses which impair the strength of the legal safeguards erected for beneficiaries are strongly disfavored and strictly construed. *See* Sheldon F. Kurtz, *Kurtz on Iowa Estates,* § 10.10, at 381–383 (2d ed. 1989).

In this case, we find the provisions in the will, set forth earlier in this opinion, allowed Gene Jr. considerable latitude in operating the Estate's businesses, including permission to self-deal and receive reasonable compensation for the services he provided.

Inherent in our conclusion is the finding that Gene Jr., engaged in self-dealing. Shortly after his father's death he appointed himself president of his father's companies. Throughout the following eight years, he received "salaries" in excess of $450,000, although he received no salary during 1987. Personal benefit in dealing with trust assets is clearly the signpost of self-dealing, and we find Gene Jr. received great personal benefit from his dealings with trust assets, thus constituting self-dealing.

■ Finally, we turn to the questions surrounding the compensation Gene Jr. received while acting as president of the corporations.

The Restatement (Second) of Trusts is instructive:

> [I]t is not necessarily improper, however, for a trustee to receive compensation as an officer of a corporation, shares of which he holds in trust, even though the shares represent a controlling interest in the corporation, if he performs necessary services as such officer, and *receives no more than proper compensation for such services.*

Restatement (Second) of Trusts § 170 comment *o* (1959) (emphasis supplied); *See also Coster v. Crookham*, 468 N.W.2d 802 (Iowa 1991) (adopting the Restatement (Second) of Trusts § 170); *Armstrong v. Beckner*, 92 Cal.App.3d 717, 154 Cal.Rptr. 889 (1979); *Bartlett v. Dumaine*, 128 N.H. 497, 523 A.2d 1 (1986).

Thus, benefit from self-dealing in the form of reasonable compensation, when permitted in the testamentary document, does not necessarily void the payment of compensation. However, it is implied that the compensation be reasonable.

■ Gene Jr. carries the burden of showing the compensation he received was reasonable. The trial court determined he had received an average of $60,000 per year for the years he managed the corporations, based on receipt of $474,768 for eight years of employment. We find no basis in the record to support this conclusion. Gene Sr. died on May 31, 1981. Gene Jr. then inter-

viewed and hired another manager, who was employed for approximately one month. The record indicates Blackhawk was liquidated in November 1984 and Transit was liquidated in 1988. Gene Jr. did not pay himself compensation in 1987. Thus, the key time period for determining reasonable compensation is mid–1981 through 1988, but not including 1987, which is a maximum total compensable period of six and one-half years. For nearly half of that time, he was managing only one of the companies since Blackhawk had been liquidated in 1984. In addition, Gene Jr. did not provide an accounting of the actual time he spent from which we may evaluate the reasonableness of the compensation. We do note his father received $39,500 as total salary during the last full year of his life, considerably less than the compensation Gene Jr. paid himself. We have searched the record in an attempt to ascertain the salary Gene Jr. agreed to pay Jim Tiedje, the manager he initially hired to manage the corporations as we believe this may have been illustrative of the amount Gene Jr. believed the position was worth. However, if any salary was paid to Mr. Tiedje, it does not appear in the transaction report provided to us. Accordingly, we remand this cause to determine the amount of reasonable compensation, in a manner consistent with this opinion. In those proceedings, Gene Jr. carries the burden of showing the compensation he received from the management of the corporations was reasonable. Because Gene Jr. argues that the compensation he was entitled to from the corporations should be similar to the amount he was making from his law practice in order to allow him to maintain his life-style, we grant Carol's subpoena duces tecum of Gene Jr.'s federal income tax returns for tax years 1979–1990, as evidence at the hearing.

### III. Receipt of Executor and Attorney Fees Without Prior Court Approval.

■ Carol contends Gene, Jr.'s receipt of executor and attorney fees without prior court approval was impermissible. Gene, Jr. argues no court approval was required under the terms of the will. He contends

that Article VII, provision 6 allowed him to employ and remunerate himself without court approval. It is well settled that Iowa Code sections 633.197, 633.198, and 633.200 expressly require court approval for compensation of executors and attorneys, and we again recognize that here. However, we note provision 6, read with the concluding clause exempting those acts from court approval, allow Gene, Jr. to employ himself as an attorney. However, because we strictly construe legal safeguards erected for the protection of beneficiaries, we will not here allow fees in excess of the statutorily allowed maximum amount. We reverse the district court's decision to grant Gene extraordinary fees. We remand for further hearing on ordinary and extraordinary fees.

## IV. Cross–Appeal: Liability for Advance Distributions.

■ Gene cross-appeals, contending the trial court erred in requiring him to return to the estate advance distributions in the sum of $79,837.25. He contends, although he originally labeled these amounts "advance distributions," they were actually "payments" for his services and should be permitted.

We agree with the district court. The terms of the will, upon which Gene so heavily relies, do not allow advance distributions and we do not allow them here. We affirm the trial court's decision requiring Gene to return this amount to the trust.

**AFFIRMED IN PART; REVERSED IN PART; and REMANDED.**

All Judges concur, except SACKETT, J., who dissents.

SACKETT, Judge, dissenting.

I dissent. I would affirm the trial court.

The question is objections to the closing of Gene Snapp, Sr.'s estate. The objections have been made by a natural daughter of the decedent, attorney Carol D. Barron. Carol lives in Florida and her existence was not known to the executor or the decedent's other heirs until nearly seven years after the estate was opened.

Gene Snapp, Sr. died in May 1981. To the best of his family's knowledge, he left surviving him a wife, an adoptive daughter, and a natural born son. Gene Sr. had died testate and his will provided for his son, Gene Jr., to be executor and trustee of a pour over trust. Gene Jr., an attorney and a certified public accountant, has served as executor and attorney for the estate since it was opened in 1981.

In February 1988, Gene Snapp, Jr. learned he might have a living half-sister when he received a letter from the objector addressed to his late father. In the letter, the objector was seeking to determine if the decedent were her natural father.

The estate had a number of businesses. From 1981 until 1988 the estate was open and Gene Jr. engaged in winding up his father's affairs. While court approval was not sought for the actions Gene Jr. took, the actions were done with the approval of his father's wife and his sister, the only known interested parties. Even if court approval had been obtained, it would have been given without notice to the objector, consequently, having had court approval would not have resolved any issues as to this objector.

By the time the objector appeared, the executor had liquidated the businesses of the decedent, the real estate had been sold, a number of tax issues had been negotiated, and the minority stockholders were retired. The trial court determined Gene's efforts had resulted in an increase of $1,200,000 in the estate's assets.

There is nothing in this record to show the executor was not diligent in locating the objector. She was born in January 1948 of a marriage of very short duration. The decedent had last paid child support for her in 1956. She was raised as the child of the man her mother married after she divorced the decedent. She and her family lived in the southern United States.

The sole objector is Carol, the newly discovered daughter. She challenges factors that happened when Gene Jr. thought he was operating with the consent of the only known interested parties. He did not

know of Carol, therefore, she would not have been notified of any application seeking court approval and any order entered would not have been binding on her.

My review of the record convinces me that any person performing the duties of running and liquidating the decedent's businesses had a difficult assignment. I find no valid reason to disturb the findings of the trial court who had an opportunity to review the work done on the estate.